Filed 3/21/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S058157 |
| v. | ) | |
| | ) | |
| MICHAEL NEVAIL PEARSON, | ) | |
| | ) | Contra Costa County |
| Defendant and Defendant. | ) | Super. Ct. No. 951701-2 |
| _____ | ) | |

A jury convicted defendant Michael Nevail Pearson of the first degree murders of Ruth Lorraine Talley and Barbara Garcia with personal use of a firearm and found true the multiple-murder special-circumstance allegation. (Pen. Code, §§ 187, 190.2, subd.(a)(3), former § 12022.5, subd. (a).)[1] After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4, subd. (e)) and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# I. FACTS

## A. Guilt Phase

### 1. Prosecution Evidence

#### a. Introduction

On the afternoon of Tuesday, April 25, 1995, defendant, a receptionist with the Conventional Housing division of the Richmond Housing Authority (RHA) was fired from his job because he had repeatedly threatened to "do a 101 California," referring to the infamous 1993 massacre of numerous employees in a law office located at 101 California Street in San Francisco committed by Gian Luigi Ferri, a disgruntled client of the law firm.[2]  Minutes later, defendant hunted down and fatally shot two of his former coworkers, Lorraine Talley and Barbara Garcia.  These facts were undisputed at trial.  The sole issue for the jury to decide in the guilt phase was whether defendant premeditated and deliberated the murders.

#### b. Defendant's employment at the RHA and statements to coworkers before the murders

In January 1993, defendant began working in a temporary position for the City of Richmond in the Employment and Training Department.  He worked for that department for a year and then his employment was terminated.  In July 1994, defendant was hired in a temporary position as an office assistant with the Section 8 division of the RHA, which handled the federal rental subsidy program.  After about six months, he was hired by the Conventional Housing division in a

---

[2]     Sward, *101 California — Legacy of Horror, Highrise massacre left behind change, challenges*, S.F. Chronicle (June 30, 1998), available online at <http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/1998/06/30/MN37101.DTL> [as of March 21, 2013].)

permanent position as a receptionist. The terms of his employment included a six-month probationary period, which was scheduled to terminate three days after the murders. Talley was defendant's supervisor.

Defendant chatted often with coworker Learinza Morris, and complained that he was treated unfairly and had a heavier workload than his coworkers. Defendant specifically mentioned Talley and Shirail Burton in making these complaints. About two months before the shootings, defendant mentioned to Morris that he had received a poor performance evaluation and that it was unjustified because "his work wasn't being evaluated properly—truthfully." Defendant felt he was being "railroaded to a degree." About three weeks before the shootings, defendant told Morris that he wanted to be transferred back to the Section 8 division of the RHA and that "[t]hey better not mess with me because there might be a 101 California."

Some months before the shootings, while commuting to work, defendant told coworker Leona Kelly, "Well, I know one thing, she [Talley] tries to get rid of me or they try to get rid of me, it's going to be another 101 California."

Defendant complained to Ronald Keeton, a housing project manager at the Conventional Housing division of RHA, that he was being treated unfairly at work. About two or three months before the shootings, defendant told Keeton, "I ought to pull a 101" or "if something happens to me, or if they get on me or make me quit my job or lose my job[,] there might be another 101 going on here." Keeton believed defendant was joking.

On the Friday before the shootings, defendant approached Janet Robinson at her desk at the RHA and said, "Sometimes, you know, I feel like doing a 101 California Street here." Robinson said, "No, no, you wouldn't do that Michael" and "If you do that, I'll lock myself in the safe." Defendant assured her that he would not shoot her. He told her to not tell anyone about what he had said,

3

claiming it was "just a joke." Although Robinson was afraid to reveal the threat, she mentioned it to Garcia, who became terrified.

### c. Defendant's termination

On the day of the shootings, Art Hatchett, the RHA's director, and Talley asked defendant to meet with them in Hatchett's office. Hatchett informed defendant that a decision had been made to terminate his employment at the end of his probationary period because his job performance was unsatisfactory. Defendant was asked to return his building keys and identification badge, and he did. Hatchett gave defendant his business card and offered to discuss employment opportunities with RHA and the city at some point in the future. Defendant was given his final paycheck, and Hatchett terminated the meeting, which had lasted about six minutes. Defendant was upset and close to tears, but appeared to be "in control of himself" and not "enraged." Hatchett had decided not to discuss the true reason for defendant's termination, his threats to "do a 101 California."

After the meeting, Hatchett walked to Patricia Jones's office and informed Jones that defendant had been fired. Earlier, Hatchett had told Jones and employees of the personnel department that he intended to fire defendant. They had arranged to have a police officer posted outside the building when Hatchett and Talley met with defendant to discuss his termination.

Hatchett returned to the reception area, where defendant was gathering his personal items at his desk. Defendant did not appear to be enraged, and Hatchett was not concerned that defendant would become violent. When defendant walked down the hallway, Hatchett followed him. Defendant confronted Talley in the office of Hatchett's secretary, Mary Martinez, where Talley had remained after the meeting. Defendant asked Talley if she would speak privately with him. By this point, Hatchett had arrived at Martinez's office, and he told defendant that they

4

could meet again in his office. Hatchett, Talley, and defendant went to Hatchett's office, and defendant asked Talley whether "that was it." Talley responded that, "if you are speaking of this job as a receptionist, yes, this is all." Defendant continued to question Talley about his termination, asking her whether she thought it was fair. Talley did not respond to the question but stated that she was preparing to take vacation and that if defendant had further questions, he could discuss the matter with Hatchett. Talley spoke firmly but respectfully.

### d. Talley's killing

After the second meeting, Hatchett walked with defendant back to the reception area. Hatchett followed defendant as he moved through the office. As defendant continued to gather his personal belongings, he appeared hurt and sad. Meanwhile, Talley returned to Martinez's office.

Defendant left the reception area but Hatchett did not follow him because he believed defendant was going to the restroom. Moments later, Hatchett was standing with housing project manager Ronald Keeton when he heard an employee screaming that defendant had a gun. He looked down the hall and saw a number of employees scrambling to leave the building. When Hatchett saw defendant running down the hallway holding a gun in his right hand, Hatchett ran outside the building to the parking lot.

Pamela Kime and Eric Spears were working in the conference room when they heard loud voices coming from the hallway. Defendant was arguing with Talley. He told her that he wanted to talk to her again, and she responded that she had said everything she wanted to say and that they had nothing further to talk about. Defendant's voice became louder as he asked, "You mean all of this work I've done is for nothing?" Talley repeated that she had nothing more to say, and defendant asked her, "So are you saying that all of the time I've spent here has

5

been for nothing?"  Talley opened the conference room door and yelled, "Go get Art [Hatchett]!"  Defendant repeated his question, and Talley ran around the conference table and rushed past Kime.

Spears saw defendant reach for a gun from his coat, and said, "No, Michael, no Michael."  Defendant looked at Spears momentarily and shot Talley, who fell and slumped across a chair.

After Kime heard the first gunshot, she turned around in her chair and saw defendant standing over Talley, pointing his gun at her and saying,  "I ain't no joke.  I ain't no joke."  Defendant again looked at Spears, shrugged his shoulders, and again shot Talley, who had not moved.  Defendant held his arm straight out as he fired the shot.

As defendant left the conference room, Kime stood up.  Defendant returned, pointed the gun at her, and told her to get back "because he wasn't no joke."  Kime sat down.  Defendant lowered his gun and left the conference room. Kime checked on Talley, who was still alive with blood spurting from her neck. Spears tried unsuccessfully to call 911, and grabbed Kime, telling her they needed to get out of there.  Kime decided to remain behind and try to stop the bleeding from Talley's neck.

*e.  Garcia's killing*

After hearing the gunshots, Robinson, Garcia and housing specialist Shirail Burton ran into Jones's office.  Burton climbed out a window.  Another employee followed her.  Robinson and Jones hid under the desk.  Garcia ran behind Jones's desk and became trapped in a corner by a computer table, "so afraid that she was running in place," "whimper[ing]."  Defendant fired three shots at Garcia.

Robinson came up from under the desk and pleaded with defendant, "Michael, please don't kill me."  Defendant said, "Janet, baby, I told you I wasn't

6

going to shoot you." Robinson understood defendant as referring to the conversation they had had the previous Friday. Defendant left. Garcia was sprawled on the floor, breathing heavily, and making gurgling sounds.

On arriving at the scene, police found defendant in the administrative offices and took him into custody.

### f. Other evidence

Defendant had legally purchased from a pawn shop the Lorcin .380-caliber semiautomatic firearm he used in the shootings. After the mandatory 15-day waiting period, he returned to the pawn shop the day before the shootings, picked up the gun, and purchased 50 rounds of .380-caliber ammunition. That evening, defendant went to the shooting range and bought targets for shooting practice, as well as additional ammunition.

When police took defendant into custody, an officer performed a patdown search for a weapon and found none. When the officer asked defendant where he put his gun, defendant said that he placed it on the ledge outside the window. The gun was recovered from a planter box outside the window. It had a bullet jammed in the ejection port, and the magazine clip contained a single unfired PMC .380-caliber round. Three expended .380-caliber shell casings were recovered from Jones's office. Two expended .380-caliber shell casings were recovered from the floor underneath the table in the conference room.

Investigators recovered a lunch box from the reception area that contained a type of plastic bag supplied with the purchase of a Lorcin gun of the kind defendant purchased. Hatchett saw the lunch box on defendant's desk before he shot the victims. At the police station, an unexpended .380-caliber bullet was recovered from defendant's coat pocket.

7

The day after the shootings, police searched defendant's apartment in Oakland. They recovered an empty box of .380-caliber ammunition, targets with several bullet holes in them, and a book entitled, "Madness in Criminal Law" by Norval Morris. A receipt dated April 24, 1995, for defendant's purchase of a Lorcin .380 semiautomatic firearm from United Jewelry Mart was recovered from inside one of the empty ammunition boxes.

Both Talley and Garcia died as a result of gunshot wounds to the head. Additional evidence based on the autopsy reports and the testimony of a forensic pathologist, Dr. Brian Peterson, is discussed in part II.B.8., *post*.

### 2. *Defense evidence*

During voir dire and at various other times throughout trial, including guilt phase closing argument, defense counsel conceded that defendant shot the victims with an intent to kill, but argued he did not act with the premeditation and deliberation required for first degree murder. The defense presented extensive evidence of the acrimonious working environment at the Conventional Housing division, the hostility that existed between supervisor Lorraine Talley and her coworkers, accusations that Talley showed favoritism toward certain employees, and defendant's belief that Talley and Burton had treated him unfairly.

In addition, Dr. Carol B. Walser, a psychologist who evaluated defendant in April 1996, testified about his mental state at the time of the shootings. Dr. Walser opined that at the time of the shootings, defendant was delusional and suffered from a "brief psychotic disorder with marked stressors," disorganized functioning, chronic posttraumatic stress disorder, an organic "cognitive disorder not otherwise specified," and an impulse control disorder secondary to that disorder. In forming this opinion, Dr. Walser relied on her psychological and neuropsychological evaluation of defendant and her review of the analysis of

defendant's Minnesota Multiphasic Personality Inventory II (MMPI-2) prepared by Dr. Alex Caldwell; the results of the Rorschach test conducted by a psychologist, Dr. John Kincaid; a psychological evaluation of defendant performed by Dr. George Wilkinson, a psychiatrist; and the report of defendant's magnetic resonance imaging (MRI) results.

### 3. Rebuttal evidence

Dr. William Hoddick, an expert in radiology and diagnostic medical imaging, reviewed defendant's brain MRI and testified that it showed tiny fossa in the pariventricular and subcortical white matter of his brain. Such abnormalities are seen in brain scans of people over age 50 but generally not those without a history of diabetes or cigarette smoking. Also, tiny fossa are commonly present in those who abuse speed, crank, methamphetamine, or cocaine. Dr. Hoddick opined that the fossa were not "clinically significant" abnormalities and would not explain a person's behavior.

Dr. Hoddick said the MRI also showed a small amount of cerebral spinal fluid on defendant's left temporal lobe, consistent with an arachnoid cyst, but "[t]here was no mass effect or pressure associated with it." Dr. Hoddick could see no reason why this particular finding would cause a change in person's behavior.

Two days after the shootings, at the request of the prosecution, Dr. Paul Berg, a psychologist, interviewed defendant while he was in custody in jail. Dr. Berg did not find defendant to be psychotic and disagreed with Dr. Walser's diagnosis that defendant was delusional and suffering from a brief psychotic disorder when he shot the victims.

Dr. Berg opined that when defendant told Talley "I ain't no joke" before he fired the fatal shot to the back of her head, he acted out of anger, retribution, and revenge. Defendant exhibited organized behavior "[w]hen it became apparent to

9

him that he could not talk to [Talley], [. . .] and he shot her and then after the first shot delivered a lethal shot to her head." In Dr. Berg's opinion, defendant's actions belied any claim that he was delusional. Defendant had been concerned for weeks before the murders that he would be fired from his job and he was in fact discharged. According to Dr. Berg, defendant was "absolutely" oriented in reality when he killed Talley.

Finally, Dr. Berg opined that defendant was organized and had a "pretty good memory" when he reminded Robinson, immediately after he fatally shot Garcia, that he had promised her he would not shoot her. The remark indicated that defendant selected his victims and had the ability to recall and refer to a previous conversation. In addition, that defendant brought a concealed gun into work suggested "organization . . . in case he got fired."

### B. Penalty Phase

#### 1. Prosecution evidence

Numerous witnesses testified about the impact of the victims' deaths on their family, friends, and the community at large. In addition, several eyewitnesses to the murders testified about how they were affected by the crimes and the victims' deaths.

#### 2. Defense evidence

Defendant helped Gary Reynolds, an acquaintance, overcome his cocaine addiction. Defendant was a positive influence in Reynolds's life and taught him he could have a better life and be a better person.

Defendant's uncle, Charles Thomas (Charles), was a childhood friend of defendant's mother, Mary Jane Thomas (Mary Jane), and had known defendant all his life. Charles knew defendant's father, "Junior," who had abandoned defendant and his mother shortly after defendant was born. Charles could not recall anything

10

unusual about defendant's upbringing, except that when defendant was four or five years old, and for unknown reasons, he was sent to live with his biological father's family. However, defendant eventually returned to live with his mother. Within a few years of defendant's return, Mary Jane and her boyfriend, Pete, had two sons together. Pete abused Mary Jane, and they separated when defendant was six or seven years old. About a year later, Mary Jane married Charles's brother, Lafayette Thomas. Thereafter, the couple, defendant, and defendant's half brothers lived in a housing project in San Francisco. Sometime in the 1960's, they moved to Oakland.

Charles knew defendant to be "a very nice kid" who was always "very respectful towards him." He was "totally surprised" when he learned about the shooting and "figured somebody must have really shoved Michael over the cliff. Somebody must have pushed him really hard. . . . He's never been a violent person."

Mary Jane described defendant as a normal, happy, playful child and an average student, but stated that he was something of a loner. Defendant had seizures in his early childhood years, but was never tested to see if the seizures were related to any abnormal brain activity or might cause him any mental health problems.

After defendant served in the military, he often would talk to himself. He developed a drug addiction, sought treatment at a rehabilitation center, and overcame his addiction. Defendant was happy and proud when he was first hired by the City of Richmond for a temporary position. He wanted to buy his mother a home with the money he earned. After he was hired by the Conventional Housing division at RHA, he talked with his mother about problems he had with his supervisor.

11

Robert Young, head chef at the Contra Costa County Jail in Martinez, testified that, while defendant awaited trial, he and defendant talked about the murders and defendant appeared to express remorse.

Defendant's half brother, William Keith Pearson, recalled that when defendant was about 13 years old, he had a seizure while playing in a park. Defendant was a good son and brother, rarely had to be disciplined, did well in school, and graduated from high school. Defendant believed he was being treated unfairly in his position at the Conventional Housing division, although he never identified the person he believed was mistreating him.

## II. DISCUSSION

### A. Jury Selection Issues

#### 1. Restriction on voir dire

Defendant contends that the death-qualification portion of voir dire was inadequate because the trial court failed to clarify the term "mitigating circumstance" or to ask prospective jurors whether they could recognize and consider particular facts as mitigating under section 190.3. The claim lacks merit.

#### a. Factual background

Before death qualification voir dire commenced, the prospective jurors completed a written questionnaire. In response to a series of multiple choice questions, the prospective juror who eventually was seated as Juror No. 4 (hereafter, Juror No. 4) indicated that the state should "sometimes" (as opposed to "always" or "never") impose the death penalty on "everyone" who kills unlawfully, intentionally, or with deliberate and premeditated intent. In the adjacent explanation section, Juror No. 4 added that "[t]here could be circumstances, such as self defense, fear of life, accidental occurrences, etc. [in which the death penalty should not be imposed]" The trial court asked Juror No. 4

12

whether he could properly consider and weigh evidence offered in aggravation and mitigation in deciding penalty, and whether he could vote for a life sentence if the mitigating circumstances outweighed the aggravating and impose the death penalty if the opposite were true. Juror No. 4 stated he could.

Outside the presence of the panel, defense counsel, Mr. Veale, expressed concern that, based on Juror No. 4's written responses to the questionnaire, the juror did not understand that if a defendant was found not guilty of murder because, for example, he killed in self-defense or the killing was the result of an accident, then no penalty trial was required. He asked the court to inquire whether the juror would vote for a life sentence only if the case involved self-defense or accidental death. The court denied defense counsel's request, finding that the mitigating circumstances the juror identified did not represent the only circumstances not warranting death, but were merely representative of those in which he could vote for life. In addition, the court precluded counsel from asking prospective jurors about case-specific mitigating factors. After the conference, counsel was permitted to clarify for Juror No. 4 and the other panelists that a killing committed in self-defense is not murder and that a defendant who killed under these circumstances would not face a penalty trial. At the prosecutor's request, the court read to the prospective jurors CALJIC No. 8.85, which listed the statutory sentencing factors they would later be asked to consider in deciding penalty.

### b. Forfeiture

The People assert that defendant failed to preserve this claim for review because he did not utilize all of his peremptory challenges, express dissatisfaction with the jury as sworn, or raise a specific constitutional challenge to voir dire. We disagree.

13

"A defendant's failure to raise a for-cause challenge or to exhaust all peremptory challenges is relevant to the question whether he has preserved a claim on appeal that members of his jury were unacceptable to him." (*People v. Taylor* (2010) 48 Cal.4th 574, 606.) But without an adequate voir dire, "the defense is denied information upon which to intelligently exercise both its challenges for cause and its peremptory challenges. Because the exercise of peremptory challenges cannot remedy the harm caused by inadequate voir dire, we have never required, and do not now require, that counsel use all peremptory challenges to preserve for appeal issues regarding the adequacy of voir dire." (*People v. Bolden* (2002) 29 Cal.4th 515, 537-538.) In addition, as discussed below, defense counsel made multiple requests to question the prospective jurors regarding their ability to properly consider the statutory mitigating factors. Under these circumstances, the claim is not forfeited on appeal. (See *People v. Taylor*, *supra*, 48 Cal.4th at p. 606.)

### c. Discussion

Defendant contends that the trial court was obligated to ask prospective jurors whether they were able to identify and consider specific circumstances as mitigating. He contends that questioning along these lines was necessary to ensure that the prospective jurors would not limit their consideration of mitigating circumstances to those identified by Juror No. 4, self-defense and accident, which did not apply in this case. We disagree.

A prospective juror may be excused for cause when the juror's views on capital punishment would prevent or substantially impair the performance of his or her duties as a juror. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.) A prospective juror is substantially impaired within the meaning of *Witt* and may properly be excused for cause if he or she is unable to follow the trial court's

14

instruction and "conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." (*People v. McWhorter* (2009) 47 Cal.4th 318, 340.) " 'Our decisions have explained that death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.] In deciding where to strike the balance in a particular case, trial courts have considerable discretion.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 47).

Keeping these principles in mind, this court has held that "either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial evidence, that would cause them not to follow an instruction directing them to determine penalty after considering aggravating and mitigating evidence." (*People v. Cash* (2002) 28 Cal.4th 703, 720-721.) In other words, a trial court errs in precluding all counsel "[from] ask[ing] jurors if they would automatically vote for or against death 'in cases involving any generalized facts, *whether pleaded or not*, that were likely to be shown by the evidence' [citation]." (*Id*., at p. 720.)

Here, defense counsel was permitted to ask prospective jurors whether they could weigh all the evidence before deciding penalty in a case involving multiple murder and whether they could consider a defendant's lack of criminal history as mitigating. Counsel was also permitted to clarify for the prospective jurors that a defendant who killed in self-defense did not commit murder and would not face a penalty trial. Indeed, as this court has recognized, "it would be 'rare . . .' to find mitigating evidence in a capital case which could justify or excuse the defendant's

15

conduct." (*People v. Crandell* (1988) 46 Cal.3d 833, 884.) Counsel informed the prospective jurors that defendant would not rely on a defense of either self-defense or accidental death. Therefore, the trial court did not err by precluding counsel from further questioning the prospective jurors regarding these specific circumstances.

Defense counsel also sought to describe for the prospective jurors various circumstances other than self-defense and accidental death that could properly be considered among the statutory mitigating factors, and to ask whether they would consider such factors mitigating. But counsel are not entitled to indoctrinate the jurors as to a particular view of the facts and ask whether they would cause him or her to vote for a specific penalty. (*People v. Jenkins* (2000) 22 Cal.4th 900, 991.) The court did not err in precluding counsel from pursuing this line of questioning.

Further, to the extent defendant contends the trial court was required to inform the prospective jurors that they *must* give mitigating effect to a defendant's lack of prior criminal history, he is mistaken. "The absence of prior violent criminal activity and the absence of prior felony convictions are significant mitigating circumstances in a capital case, where the accused frequently has an extensive criminal past." (*People v. Crandell*, *supra*, 46 Cal.3d at p. 884.) However, what import, if any, a juror assigns to relevant aggravating and mitigating circumstances is solely for the juror to decide. (See *People v. Clark* (1992) 3 Cal.4th 41, 165; CALJIC No. 8.88.)

*2. Comments regarding the penalty of life without possibility of parole*

Defendant contends the trial court erroneously informed prospective jurors during death qualification that they were permitted, but not required, to vote for a life sentence if the mitigating circumstances outweighed the aggravating circumstances. We disagree.

16

During voir dire of the third panel of prospective jurors, one panelist indicated that he would never be able to vote for the death penalty under any circumstances, and thus would be unable to participate in penalty phase deliberations. The trial court told him that "it isn't the duty of a juror to vote for death or life without the possibility of parole, but it's the obligation of the jury to at least be able to consider those things." It then asked whether it was "getting the [correct] impression from your comments you could not do that?" He responded, "That's correct." Thereafter, this panelist was excused. Two of the remaining panelists eventually served on the jury, as Jurors No. 6, the foreperson, and No. 11.

While examining the prospective jurors of the fourth panel, the court stated, "If you find that . . . the mitigating evidence outweighs the aggravating evidence, you could vote for life without the possibility of parole. As a matter of fact, the instructions as I would indicate to you [] suggest that that should be a consideration [. . .] [as] part of [. . .] [your] analysis . . . . [¶] But as you can see there is no burden of proof in that particular portion of the case. It is very much a decision that's made by each juror after they weigh and consider the aggravating and mitigating factors." One member of that panel sat on the jury as Juror No. 1.

Preliminarily, defendant forfeited his ability to challenge the court's explanation by failing to make a specific and timely objection. (*People v. Mills* (2010) 48 Cal.4th 158, 170.) In any event, the claim lacks merit.

Defendant contends that the court's comments to the third and fourth panels erroneously "instructed" the prospective jurors that they were not required to vote for a life sentence under any circumstances, and that this information contravenes

section 190.3.[3]  Even assuming the court's comments were error as defendant suggests, any error was harmless.

The court's statements during jury selection were not the full instructions regarding the jury's deliberative process.  The full jury instructions came only after the evidence portion of trial, when the court instructed the actual jury regarding its obligations.  (See *People v. Edwards* (1991) 54 Cal.3d 787, 840-841.)  Before deliberations, the court instructed the jurors to follow its penalty phase instructions and "[d]isregard all other instructions that were given to you in other phases of this trial."  Additionally, the jurors were instructed under CALJIC No. 8.84.2 (now 8.88) as follows:  "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."  (CALJIC No. 8.84.2 (1986 rev.).)  We presume that jurors understand and follow the court's instructions.  (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

Further, we reject defendant's related contention that in the absence of an "instruction" to the prospective jurors that they must vote for life if the mitigating evidence outweighed the aggravating evidence, the voir dire process failed to identify pro-death jurors who would disregard the law and vote for death regardless of the weight of mitigating evidence.  He asserts that the court's examination of the panelist who became Juror No. 11, for example, failed to obtain an assurance from this juror that he could vote for life based on the weight

---

[3]     Section 190.3 provides in relevant part:  "If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole."

18

of mitigating evidence presented. The record reveals that, although this juror initially indicated that he would hesitate to vote for life in such a scenario, he did so only in response to inartfully phrased questions posed by the court. In context, this juror made clear that he could keep an open mind during the penalty phase and consider all of the evidence offered in aggravation and mitigation in determining the appropriate penalty. Defendant identifies no juror who indicated he or she would impose a death sentence without regard to the weight of any mitigating evidence presented. As we have repeatedly stated: " '[t]he only question the court need resolve during this stage of the voir dire is whether any prospective juror has such conscientious or religious scruples about capital punishment, in the abstract, that his views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " ' [Citation.]" (*People v. Visciotti* (1992) 2 Cal.4th 1, 47; *People v. Clark* (1990) 50 Cal.3d 583, 597.) The court's voir dire was adequate in this regard.

### 3. *Comments regarding aggravating circumstances*

Defendant contends that the trial court erred when it stated to prospective jurors during the death qualification portion of jury selection that they could consider the bare elements of murder (e.g., intent to kill, premeditation, deliberation) and "all" of the crime facts as aggravating factors under section 190.3, factor (a), which permits jurors to consider the "circumstances of the crime" in deciding penalty. As a result, defendant claims the court's examination of prospective jurors was inadequate to reveal a potential inability or unwillingness to follow CALJIC No. 8.88, which defines the term "aggravating factor" as "any fact, condition or event attending the commission of a crime which increases its severity or enormity, or adds to its injurious consequences *which is above and beyond the elements of the crime itself*." (Italics added.) Defendant

19

maintains that because neither the court nor counsel could identify jurors who were disqualified on this basis, the jury as sworn was "tainted." We disagree.

According to defendant, the court erroneously defined "aggravating circumstances" while it conducted individual voir dire of certain pro-life or pro-death prospective jurors, none of whom were selected to serve on the jury. For example, in qualifying a member of the first panel, the court stated: "In phase two you are going to be asked to evaluate mitigating and aggravating factors. Certainly one of the aggravating factors may be the crime facts themselves, such as whether or not this was deliberate and premeditated murder." To a member of the third panel, the court commented on the standard instruction defining deliberate and premeditated murder (CALJIC No. 8.20), as follows: "Based on the instruction[] I have just given you, I can tell you that a first degree murder is a murder that is committed with premeditation and deliberation. All right. That is one of the crime facts you consider in the penalty phase of this trial." It then asked this prospective juror, "Do you feel based on your current frame of mind you would be able to evaluate possible mitigating circumstances as well as the crime facts before you determined what penalty to impose?"

Preliminarily, defendant's failure to make a timely and specific objection on the ground he now raises forfeits the claim on appeal. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1324.) In any event, the claim fails on the merits.

We have repeatedly rejected related arguments that a penalty phase jury is precluded from considering in aggravation "*any* aspect of the crimes that was part and parcel of the elements of first degree murder." (*People v. Coddington* (2000) 23 Cal.4th 529, 640, italics added; see also *Lowenfield v. Phelps* (1988) 484 U.S. 231, 246 ["the fact that the aggravating circumstance duplicated one of the elements of the crime does not make [the death] sentence constitutionally infirm"]; *People v. Millwee* (1998) 18 Cal.4th 96, 164 [the jurors' consideration of the bare

20

"elements" required for conviction of first degree murder in aggravation as a "circumstance" of the crime did not "preclude[] any meaningful distinction between first degree murderers who receive death and those who do not"]; *People v. Marshall* (1990) 50 Cal.3d 907, 945-946 [the "triple use" of the same crime facts does not offend the cruel and unusual punishments clause].) "All circumstances of the crime or crimes may be considered." (*People v. Coddington*, *supra*, 23 Cal.4th at p. 640; see § 190.3, factor (a).)

Here, the court preliminarily informed the prospective jurors in each panel that the purpose of the death qualification portion of jury selection was to ensure that their personal views would not preclude them from voting for either penalty. By its questions and comments, the court stressed that at the beginning of any penalty trial, a juror must have an open mind on the question of punishment and consider all the evidence offered in aggravation and mitigation before deciding penalty. Moreover, the court repeatedly emphasized that a juror could not vote for death simply because the defendant was convicted of first degree premeditated murder and a special circumstance was found true. As indicated above, however, the court's remarks varied slightly on occasion, and some may have been understood to mean that the elements of the crimes and the facts were themselves aggravating factors. Nonetheless, any error was harmless because any improper statements amounted to minor discrepancies when compared with the court's otherwise accurate description of a capital juror's duties. Additionally, neither the court nor the parties otherwise were precluded from asking additional questions in assessing whether a potential juror was disqualified.

### 4. *Prospective jurors' ability to follow the law*

Defendant contends that the trial court was not evenhanded in conducting death qualification voir dire. Specifically, he contends that, with respect to

21

prospective jurors whose questionnaire responses indicated strong support for the death penalty, the court's questions focused on their willingness to properly consider and weigh evidence offered in aggravation and mitigation in deciding penalty, and avoided the issue of whether the prospective juror could vote for life without possibility of parole. In contrast, in questioning prospective jurors whose questionnaire responses indicated strong opposition to capital punishment, the court inquired about their ability to impose a death sentence, but not whether they would consider all the evidence before deciding penalty. As a result, defendant asserts the jury selection process was unfair.

Preliminarily, because defendant did not object to the adequacy of voir on the ground he raises on appeal, the claim is forfeited. (*People v. Harris* (2005) 37 Cal.4th 310, 330.) It also lacks merit.

"Decisions concerning the qualifications of prospective jurors to serve rest within the ' "wide discretion" ' of the trial court, and the manner of the court's conduct of voir dire is ' "seldom disturbed on appeal." ' (*People v. Thornton* [(2007)] 41 Cal.4th [391,] 420.)" (*People v. Martinez* (2009) 47 Cal.4th 399, 445.)

While trial courts "should be evenhanded in their questions to prospective jurors during the 'death-qualification' portion of the voir dire, and should inquire into the jurors' attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors" (*People v. Champion* (1995) 9 Cal.4th 879, 908–909), they are not required to examine each prospective juror in the same manner, "lest the court feel compelled to conduct a needlessly broad voir dire, receiving answers to questions it does not need to ask" (*People v. Thornton*, *supra*, 41 Cal.4th at p. 425).

We disagree that the court's voir dire predisposed the selected jury to favor the death penalty. The court examined each prospective juror individually and

22

fairly in determining whether his or her attitudes would prevent him or her from performing the duties of a capital juror, and properly inquired of each prospective juror whether he or she was able and willing to follow the law, weigh the aggravating and mitigating factors, and vote for either penalty. There is no indication in the record that the court questioned prospective jurors differently based on their death penalty views. Counsel were permitted to pose questions designed to expose jurors' bias in favor of or against the death penalty that would undermine their ability to perform their duties. Furthermore, defendant does not now contend that the court erroneously excluded or retained a particular prospective juror. Thus, "[t]he trial court's questions caused no prejudice, and therefore do not warrant reversal of defendant['s] convictions." (*People v. Champion*, *supra*, 9 Cal.4th at p. 909.)

### 5. *Group voir dire on attitudes toward the death penalty*

Defendant contends that the trial court did not exercise informed discretion in denying his request to conduct the death qualification portion of voir dire with each prospective juror individually and in sequestration. The claim lacks merit.

"In *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80, this court decided that in capital prosecutions the death-qualification portion of each prospective juror's voir dire should be sequestered, meaning that it should be conducted out of the presence of other prospective jurors. This court did not hold that sequestered voir dire was constitutionally required; instead, we mandated this practice as a rule of procedure. [Citations.] In 1990, however, the voters abrogated this aspect of *Hovey* by enacting Proposition 115, which added section 223 to the Code of Civil Procedure. That statute provides, in part, that 'where practicable' the trial court must conduct voir dire 'in the presence of the other jurors in all criminal cases,

23

including death penalty cases.' (Code Civ. Proc., § 223.)" (*People v. Jurado* (2006) 38 Cal.4th 72, 100.)[4]

During pretrial proceedings, the court informed counsel of its experience using a modified *Hovey* voir dire of prospective jurors in groups of six, and solicited counsel's suggestions regarding the procedure to apply in this case. The prosecutor asked for nonsequestered voir dire because, among other things, individual sequestered voir dire would require an additional two weeks to select a jury. Defense counsel requested individualized voir dire, expressing concern that group voir dire would inhibit a juror's "full disclosure" of his or her views on the death penalty. The court acknowledged that group voir dire may not be appropriate in all cases but stated that, in its experience, jurors were more candid in responding to questions "by having other [jurors] present who could talk about their fears and anxieties and concerns about sitting on the jury." The court solicited and received additional comments from counsel and thereafter ruled that it would conduct the death qualification voir dire in groups of 25 prospective jurors.

---

**4** At the time of defendant's 1996 trial, section 223 of the Code of Civil Procedure provided: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases. [¶] Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause. [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution." (Code Civ. Proc., former § 223, added by Prop. 115, § 7, as approved by voters, Primary Elec. (June 5, 1990).)

Preliminarily, we disagree with the People's assertion that defendant failed to preserve his claim for review because he did not formally object to the court's procedure on the grounds he asserts on appeal. During the discussions regarding death qualification, defense counsel indicated his opposition to the court's intention to conduct group voir dire and offered justification for individualized voir dire. The issue is cognizable. (See *People v. Taylor, supra*, 48 Cal.4th at p. 606 [defendant who timely objects to group voir dire and proposes that the trial court conduct individually sequestered voir dire "has done all that is necessary"].)

Defendant contends that the trial court erred in denying his request for individual, sequestered voir dire because it misunderstood the scope of its discretion under Code of Civil Procedure former section 223. Specifically, he asserts that the court erroneously assumed the statute limited its discretion to conduct *Hovey* voir dire in only highly publicized cases or cases presenting unusual circumstances. Defendant also complains that the court erred by deciding the voir dire issue before it reviewed the prospective jurors' written responses to the juror questionnaire.

An appellate court reviews a trial court's denial of a motion for individual and sequestered voir dire for abuse of discretion. (*People v. Lewis* (2008) 43 Cal.4th 415, 494.)

Defendant fails to show an abuse of discretion. Viewed in context, the court's comments, described above, do not show that it misunderstood its discretion under Code of Civil Procedure former section 223. Instead, the statements reveal the court's correct understanding that whether *Hovey* voir dire was required was a matter falling solely within its broad discretion and that it might order such voir dire when warranted by the circumstances of a particular case, for example, when there had been substantial pretrial publicity. (See *People*

25

*v. Ramos* (2004) 34 Cal.4th 494, 513-514.) Nowhere did the court express an understanding that it could exercise its discretion *only* under such circumstances.

Additionally, the court invited counsel to comment on its proposed approach and solicited suggestions for any alternative procedures they cared to propose. The court's actions suggested it was well aware of its discretion under Code of Civil Procedure former section 223. Furthermore, the trial court's rejection of defense counsel's argument that individualized voir dire would yield more candid responses was reasonable. (See *People v. Taylor, supra*, 48 Cal.4th at p. 607.) The court, moreover, conducted individual, sequestered voir dire when a prospective juror expressed concerns about the death penalty and also permitted counsel to question prospective jurors about their responses to the written questionnaire.

We have held that "[g]roup voir dire may be 'impracticable' when it has resulted in 'actual, rather than merely potential, bias.' " (*People v. Taylor, supra*, 48 Cal.4th at p. 606, quoting *People v. Vieira* (2005) 35 Cal.4th 264, 288.) Defendant has not established that the trial court's comments or the prospective jurors' responses to the trial court's questions negatively affected any prospective juror. Also, defendant fails to "describe any specific example of how questioning prospective jurors in the presence of other jurors prevented him from uncovering juror bias." (*People v. Navarette* (2003) 30 Cal.4th 458, 490.) Finally, defendant has not shown that the court's failure to review the jury questionnaires before ruling in this regard resulted in the participation of any biased jurors.

Finally, defendant contends that the court's denial of his request for *Hovey* voir dire deprived him of his rights to a fair trial and impartial jury. We disagree. (See, e.g., *People v. McKinnon* (2011) 52 Cal.4th 610, 633; *People v. Avila* (2006) 38 Cal.4th 491, 559.)

26

*6. Batson/Wheeler*

Defendant claims the trial court erred in denying his motion under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson* ) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) based on the prosecutor's exercise of a peremptory challenge to excuse an African-American prospective juror.  We disagree.

During jury selection, defense counsel objected to the prosecutor's excusal of Prospective Juror S.G., an African-American, on the ground that there were "so few" African-Americans on the panel.  The trial court denied the motion, finding defendant failed to show "systematic exclusion."

"Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias.  (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.) . . . '[T]he United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made.  "First, the defendant must make out a prima facie case by 'showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . .  whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" ' (*People v. Cornwell* (2005) 37 Cal.4th 50, 66-67, quoting *Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted (*Johnson*).)" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1100.)  "[A] defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California*, *supra*, 545 U.S. at p. 170.)

27

" 'When a trial court denies a *Wheeler* motion without finding a prima facie case of group bias, the appellate court reviews the record of voir dire for evidence to support the trial court's ruling. [Citations.] We will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question.' [Citation.]" (*People v. Guerra, supra*, 37 Cal.4th at p. 1101.)

Preliminarily, defendant asserts that, because the trial court did not articulate the standard it used in denying his *Batson/Wheeler* motion, we must assume that it applied the "strong likelihood" standard that *Johnson* disapproved, instead of the correct "reasonable inference" standard under *Batson*. Defendant contends that because the court failed to properly determine whether he established a prima facie case of racial bias, it's ruling should be accorded no deference and reversal is required. We disagree.

"Regardless of the standard employed by the trial court, and even assuming without deciding that the trial court's decision is not entitled to deference, we have reviewed the record and, like the United States Supreme Court in *Johnson*, *supra*, 545 U.S. 162, are able to apply the high court's standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*People v. Cornwall*, *supra*, 37 Cal.4th at p. 73.)

Defense counsel sought to establish a prima facie case of discrimination based solely on the circumstance that the prosecutor exercised his second challenge against one of three African-American prospective jurors on the 24-member panel. On appeal, defendant contends that a prima facie case is established because, in excusing Prospective Juror S.G., the prosecutor had used 50 percent of his peremptory challenges against a group comprising only 12.5 percent of the 24-member panel.

We have held that "[a]lthough the prosecutor's excusal of all members of a particular group may give rise to an inference of impropriety, especially if the defendant belongs to the same group, that inference . . . is not dispositive." (*People v. Crittenden* (1994) 9 Cal.4th 83, 119; cf. *People v. Guerra*, *supra*, 37 Cal.4th at p. 1101 [no prima facie showing where the prosecutor excused the only Hispanic sitting in the jury box, with only two other Hispanics remaining on the entire panel].) The prosecution did not excuse all African-American prospective jurors. Defense counsel acknowledged that "[his motion] was probably [too] early" to succeed. Indeed, defendant points to no "suspicious" appearance created by the prosecutor's use of his second peremptory challenge against S.G. (See *People v. Lancaster* (2007) 41 Cal.4th 50, 76 [the percentage of African-American women excused by the prosecutor was not " 'suspicious,' " nor had it "reached a level that suggested an inference of discrimination"].) In any event, the record suggests that the prosecutor had several race-neutral reasons for challenging this juror.

During voir dire, Prospective Juror S.G. described herself as very religious and indicated she would find voting for the death penalty "hard" because of her religious beliefs. (See *People v. Hoyos* (2007) 41 Cal.4th 872, 902-903 [a prospective juror's equivocation about the death penalty and strong religious beliefs against capital punishment provide race-neutral reasons for a prosecutor's decision to exercise a peremptory challenge].) In addition, like defendant, S.G. was a "governmental" employee and "responsible to a supervisor." One of S.G.'s neighbors, who was employed by the City of Richmond, first informed her about the case. Also, S.G. indicated in her questionnaire that psychologists and psychiatrists "are good," that they "would have a good opinion" in court, and that either she or a close relative had seen a psychologist or psychiatrist. Further, S.G. was acquainted with the prosecutor from prior employment in which she had

29

cleaned his office, and also knew defense witness Connie Taylor. Each of these responses individually would provide an adequate reason other than racial discrimination to support the prosecutor's challenge.

Finally, defendant contends that a prima facie case is established based on the circumstance that Prospective Juror S.G. would not have been excusable for cause. However, "the circumstance that a juror is not subject to exclusion for cause does not, on its own, support an inference that group bias motivated the peremptory challenge." (*People v. Hoyos*, *supra*, 41 Cal.4th at p. 902; *People v. Cornwell*, *supra*, 37 Cal.4th at p. 70.)

### 7. *Asserted error in granting defendant's challenge for cause of a prospective juror*

Defendant claims that the trial court improperly granted *his* request to exclude a prospective juror for cause. Defendant challenged the juror due to concern that she would automatically favor the death penalty. The court granted defendant's challenge based on her death penalty views and in doing so, expressed concern that the prospective juror stated "she would vote according to certain feelings she had about race."

Defendant now claims that the trial court applied the *Witt* standard in a racially discriminatory manner. However, "defendant is not free to contend on appeal that the trial court erred in granting his motion to excuse the prospective juror for cause." (*People v. Schmeck* (2005) 37 Cal.4th 240, 265.) In *Schmeck*, the trial court granted the defendant's challenge for cause of a prospective juror on the ground that the prosecutor had made an assertedly impermissible comment to that juror that might later improperly infect the jury's penalty deliberations. (*Id*. at pp. 264-265.) We held the defendant forfeited the claim that the trial court erred by granting his challenge because he failed to pursue a remedy by other methods available at trial short of excusal (e.g., a clarifying instruction) for any

30

misunderstanding arising from the assertedly improper comment. (*Id*. at p. 265; see also *People v. Hill* (1992) 3 Cal.4th 959, 1003 [defendant's joinder in the prosecution's challenge for cause forfeited his claim that the trial court erred in granting the challenge].) Defendant maintains that the claim is properly before us because, as the high court has explained, a discriminatory jury selection process inflicts harm on not only the defendant but also the excluded juror and community at large. (See *Batson*, *supra*, 476 U.S. at p. 87; *Powers v. Ohio* (1991) 499 U.S. 400, 406.) However, whatever harm an erroneous ruling on a challenge for cause may inflict on the excluded juror and community at large, a defendant may waive *his* right to complain. In *People v. Edwards*, *supra*, 54 Cal.3d 787, a local television station had requested extensive media coverage of the entire trial. (*Id*. at p. 812.) The defendant objected, and the court denied the request at least during part of jury selection. (*Ibid*.) On appeal, the defendant argued that the ruling violated the public's right to a public trial. We held that the defendant could not assert the public's right to a public trial. "[D]efendant's objection to the media request waived *his* right to complain of the court's ruling on appeal." (*Id*. at p. 813.) Similarly, here, defendant waived his right to complain of asserted error in granting his own challenge for cause. "Defendant is not entitled to the windfall of a reversal of a conviction" because the court did what he requested. (*Ibid*.)

Further, to the extent defendant frames his claim as one of judicial bias or racial discrimination by the trial court in deciding his challenge for cause, it is forfeited on appeal because he failed to alert the court to the perceived bias. (See *People v. Elliott* (2012) 53 Cal.4th 535, 572 [defendant forfeited the claim that the trial court exhibited racial bias during the jury selection process by failing to raise the issue at trial].)

31

## 8. *The prosecutor's assertedly argumentative question*

During jury selection, defense counsel told the prospective jurors that defendant did not dispute having killed two people unlawfully and "the questions that you will be confronted with in this case do not have to do with ballistics or who shot what and when." Thereafter, the prosecutor asked a prospective juror whether he heard defense counsel state, "You don't have to know anything about ballistics" and whether "[it] might make a difference if somebody got shot in the head and died of arterial damage, shot in the [] back of the head, execution style. It might tell you somebody's [] state of mind at the time he pulls the trigger, right?" Counsel objected without stating a legal basis. Instead, he disputed the prosecutor's assertion, stating "[t]hat doesn't sound like ballistics to me. It has to do with medical evidence." The trial court overruled the objection. Here, defendant contends the court's ruling was erroneous because the question was argumentative.

Defendant forfeited the issue by failing to object on this basis. In any event, the court did not abuse its discretion by allowing the prosecutor to respond in kind to an argument defense counsel had made earlier in jury selection.

## B. Guilt Phase Issues

### 1. *Alleged prosecutorial misconduct and erroneous trial court rulings*

Defendant contends that, during the guilt and penalty phases, the prosecutor engaged in many instances of misconduct and the trial court made numerous erroneous evidentiary rulings.[5]

---

**5**     Here, and in most other claims, defendant contends the asserted error or misconduct infringed various of his state and federal constitutional rights. "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1)

*(Footnote continued on next page.)*

32

Except in a few instances specifically identified below, defendant did not object to the alleged instances of misconduct or trial court error or, when an objection was sustained, request that the court admonish the jury to disregard the impropriety.  Nor did defendant complain that any admonition the trial court did give was ineffective.  Therefore, defendant forfeited these claims of misconduct and trial court error.  (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

Citing *People v. Hill*, *supra*, 17 Cal.4th at pages 820-821, defendant acknowledges that his counsel did not always enter timely and specific objections, but claims that failure should be excused because an objection would have been futile and counterproductive.  This case, however, is far removed from the circumstances presented in *Hill*.  That "was an extreme case" in which "the prosecutor's 'continual misconduct, coupled with the trial court's failure to rein in [the prosecutor's] excesses, created a trial atmosphere so poisonous' that continual objections 'would have been futile and counterproductive to his client.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1212.)  The record in this case does not support

---

*(Footnote continued from previous page.)*

the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution.  To that extent, defendant's new constitutional arguments are not forfeited on appeal.  [Citations.]  [¶]  In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well.  No separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

defendant's claim, for example, that the court "was quick to find fault in defense counsel's objections" and discouraged him from making appropriate objections. Nothing in the record suggests any objections or request for an admonition would have been futile. Accordingly, as indicated below, defendant has forfeited most of the claims.

Moreover, each claim is without merit.

### a. The prosecutor's assertedly leading questions

Defendant contends the prosecutor committed prejudicial misconduct by improperly asking leading questions of several witnesses. " '[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' " (*People v. Stanley* (2006) 39 Cal.4th 913, 952; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 679.)

" 'A "leading question" is a question that suggests to the witness the answer that the examining party desires.' (Evid. Code, § 764.) Questions calling for a 'yes' or 'no' answer are not leading unless they are unduly suggestive under the circumstances. (*People v. Williams* (1997) 16 Cal.4th 635, 672; 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 165, pp. 229–230.) Furthermore, leading questions are not always impermissible on direct examination. 'Evidence Code section 767, subdivision (a)(1), provides that leading questions "may not be asked of a witness on direct or redirect examination" except in "special circumstances where the interests of justice otherwise require." Trial courts have broad discretion to decide when such special circumstances are present. [Citations.]' (*Williams*, at p. 672.)" (*People v. Harris* (2008) 43 Cal.4th 1269, 1285.)

On direct examination, the prosecutor asked RHA Director Art Hatchett, "So at least in terms of his performance on the job, [defendant] had no difficulty premeditating and deliberating?" Defense counsel objected on the ground the question was leading, and the court sustained the objection. Thereafter, the prosecutor rephrased the question: "Did you perceive any difficulty on the part of [defendant] to think out in advance the things that he needed to do to get the job done at the Housing Authority? " Hatchett answered, "No."

Defendant forfeited this claim by failing to object to the question as rephrased, and in any event, he fails to demonstrate the question was improper. The claim is therefore without merit.

Next, defendant cites as "leading" the following question that the prosecutor posed to Hatchett regarding a letter defendant wrote to Talley in which he described his "improvement goals": "So at least as of March of 1995, did you perceive any kind of defect, mental or otherwise, in the mind of [defendant] that would prevent him from thinking about things in the future?" Defendant forfeited the contention by failing to object. In any event, the question did not suggest any particular answer. Instead, it permitted Hatchett to describe his perception of any aspect of defendant's mental state that would hinder his ability to think prospectively. There was no misconduct.

Defendant next complains about the prosecutor's question to coworker Janet Robinson concerning defendant's perceptions of reality while he and she occasionally discussed current events and social issues at work. Specifically, the prosecutor asked Robinson, "And during these conversations did you ever detect any kind of defect or oddity that [caused] [defendant] to not really perceive reality at all . . .?" Robinson responded, "No, I don't think there was any defect or anything. I just think that he had a different perspective and things, he seemed to dislike—." As defendant concedes, he did not object to this question as leading.

35

Therefore, the claim is not cognizable on appeal. In any case, the question was not improper. The prosecutor did not attempt to elicit a particular response from Robinson. Rather, he offered her an opportunity to relate her observations, if any, based on her experience working and conversing with defendant at RHA, of defendant's inability to perceive reality. The same is true of the prosecutor's follow-up question to Robinson, "Did he seem to be speaking with you in an appropriate way about these issues that you talked about?" As the court indicated in overruling defense counsel's "leading" objection, the prosecutor was merely confirming Robinson's previous testimony that she did not perceive defendant as unable to communicate rationally during their conversations. There was no misconduct.

Thereafter, Robinson testified that, on the first day of defendant's employment at the Conventional Housing division at RHA, he told her he had "heard a lot about the department" when he worked at the Section 8 division. The prosecutor asked the witness, "But if I understand you correctly at least at that time he didn't share with you what [he had heard]?" On defense counsel's objection to the question as leading, the court conducted a sidebar conference and explained that it would allow the attorneys to ask leading questions for the purpose of laying a foundation or clarifying earlier testimony. Thereafter, the court sustained defense counsel's objection and, thus, contrary to defendant's contention here, he suffered no prejudice. Defendant's additional complaint that the court failed to admonish the prosecutor is forfeited because he failed to request an admonition.

Next, after Robinson testified that at times defendant violated office protocol by permitting applicants to access areas of the office restricted to employees, the prosecutor asked a series of leading questions about defendant's compliance with other office procedures. The court sustained defense counsel's

36

objections to these questions. When the prosecutor next asked the witness, "Were there times when [defendant] called you to tell you that there was [an applicant] waiting," counsel objected on the same ground. In overruling the objection, the court suggested that in the future, counsel preface their questions in terms of "whether or not." The prosecutor rephrased the question, "Can you tell us whether or not there were times when you would look up all of a sudden much to your surprise an applicant would be standing there?" Counsel complained that this question also was leading, and the court overruled the objection. Defendant now complains that the court's ruling was erroneous because the prosecutor embellished the question by suggesting the witness was "surprised" when defendant allowed applicants to enter restricted areas in the office. The question was not improper, however, because it did not suggest any particular answer. There was no error.

Next, the prosecutor asked Robinson, "There — was there at least in your perception as a Housing Specialist some unnecessary and repetitive work being done as a result of the way [defendant]—," and defense counsel objected that the question was leading. The court did not rule on the objection, and the prosecutor immediately rephrased his question, "Can you tell us whether or not there was some unnecessary work that was being done as a result of the way [defendant] was doing his job?"

Defendant complains that the question was leading. The claim is forfeited, however, because he failed to object to the question as rephrased. In any event, the question complied with the court's guidelines. Further, assuming the question suggested defendant performed unnecessary work, no prejudice ensued, as the question called for testimony cumulative of other evidence that defendant performed his job poorly.

37

Next, defendant contends that the court erroneously overruled defense counsel's objection that the prosecutor was improperly suggesting to Robinson that when defendant said, "I ain't no joke," he was "leaning over" Talley's body in a particular position. Not so. The witness had already testified that defendant was standing over Talley when he made the statement. In compliance with the court's guidelines, the prosecutor properly sought clarification on the point. The court did not err.

Next, defendant contends the prosecutor improperly questioned Ronald Keeton, a housing project manager at RHA, about defendant's statement that "he ought to pull a 101." Specifically, Keeton was asked, "you had seen publicity about just how much harm a 101 California could cause" and the "101 California" "affected a lot of people?" Defense counsel initially objected that the question was leading, but then asserted that "it's not even a question." After the court overruled the objection, the prosecutor repeated his inquiry, "I ask you it's harmed a lot of people, publicity was great because it affected a lot of people, the 101 California?" Keeton answered, "That's correct." Here, in addition to his contention that the question did not fall within the court's stated parameters concerning permissible leading questions, defendant argues that the prosecutor's posing the question was particularly reprehensible because he improperly used this examination as a dress rehearsal for his penalty phase argument that, when defendant threatened to do a "101 California," he intended the aftermath of the massacre to send "shockwaves" through the community and affect "a lot of people." Even assuming the question was improper, it was harmless. The evidence overwhelmingly showed that for months in advance of the murders, defendant repeatedly threatened coworkers that, if his supervisors were to fire him, "I ought to do a 101," "there might be another 101 California," and "it's going to be another 101 California." That is, defendant began publicizing his intentions in

38

a likely effort to have as many coworkers as possible fear and be affected by the massacre that he planned and believed would be justified by a wrongful termination of his employment. In addition, before deliberations, the court instructed the jury that statements and arguments by counsel were not evidence. The questions or remarks did not affect the trial's outcome under any standard.

Next, defendant complains of the following questions posed to Dr. Berg: (1) "do you have an opinion as to what a statement like 'I ain't no joke' might mean in terms of the psychiatric condition of the person who is speaking it?"; (2) does a crime such as Talley's murder speak of "revenge?"; (3) "Is there anything delusional or hallucinatory in a crime like [Talley's murder] in your judgment?"; (4) "is [defendant's statement to coworker Learinza Morris that he felt as if his boss was going to stab him in the back] [the] kind of information you're referring to when you suggest that especially since Mr. Pearson knew for weeks that his job was in jeopardy, there was nothing delusional about what was going on in his mind on the [the day of the shootings]"; (5) "would a person who engages in an act of work place violence necessarily be delusional or psychotic?"; and (6) "would any of those personality disorders [('obsessive compulsive and schizoid and paranoid')] in any way prevent a person from committing deliberate and premeditated murder?" However, because defendant did not object on the ground the questions were leading, the claim is not preserved for appellate review.

Additionally, none of the questions was impermissibly leading. Each was framed in accordance with the court's guidelines and none of them suggested a particular answer. Rather, each question permitted the expert to offer his opinions on matters based on his knowledge of the existence of specific facts. The questions involved the application of specific diagnoses to hypothetical scenarios that permitted the presentation of the experts' testimony in a practical, efficient manner. Contrary to defendant's contention, the fourth question properly called

39

for the expert to clarify the type of information that would form the basis of his opinion that there is nothing "delusional or hallucinatory" in a crime like defendant's murder of Talley.

### b. Speaking objections

On several occasions during defense counsel Veale's cross-examinations of Art Hatchett and Shirail Burton and direct examination of Toni Lawrence, he attempted to elicit testimony related to the purportedly "poisonous" working environment that existed at RHA before defendant's employment there. The court sustained most of the prosecutor's objections to defense counsel's questions on grounds of relevance and hearsay, and defendant does not challenge those rulings here. Rather, defendant claims that the prosecutor, Mr. Jewett, repeatedly posed improper speaking objections and, in doing so, attacked defense counsel's integrity and motives. Also, defendant asserts that the court "added to the problem" by admonishing counsel in front of the jury. The claim is without merit.

### (1) Art Hatchett

On cross-examination, defense counsel asked Hatchett, "[H]a[ve] you heard [of] complaints that [Burton] didn't do her work?" The prosecutor objected to admission of the testimony as follows: "MR. JEWETT: Judge, to suggest that this is not being offered for the truth of the matter is disingenuous. This is an effort to prove that Shirail Burton doesn't do the work that she—[¶] MR. VEALE: Judge, I'm sorry. [¶] MR. JEWETT: [] somehow—[¶] MR. VEALE: I'm sorry. If there's an objection, it seems to me there should be an objection, not more than an objection. [] MR. JEWETT: And it's hearsay again. [¶] THE COURT: I'm going to sustain hearsay at this point." Counsel proceeded without comment and subsequently asked Hatchett to confirm the existence of additional employee complaints at RHA. The prosecutor interjected, "It's calling for

hearsay. Essentially it's like defense counsel is asking the witness to confirm rumors." Counsel asked "if we could have an objection," and the prosecutor rephrased, "Objection, irrelevant. Calls for hearsay." The court sustained the objection, and counsel complained no further.

Defense counsel asked Hatchett whether he was aware of any memorandum concerning disputes between housing managers and Patricia Jones that circulated during the six-month period preceding the murders when defendant was employed by the Section 8 division. The prosecutor objected on hearsay grounds, and counsel responded that he was not offering the evidence for the truth of the matter. Before the court ruled on the objection, the prosecutor interposed a relevance objection, which the court sustained, commenting, "If you are not worried about whether or not they are true, it sounds like so much rumor mongering." Counsel did not respond, and resumed cross-examination. The prosecutor thereafter made numerous objections without comment, many of which were sustained, and a speaking objection based on speculation. Counsel did not complain about the latter, and the court sustained the objection. During counsel's further cross-examination of Hatchett, the prosecutor made several speaking objections, without any protest by counsel, and numerous objections without comment that the court sustained.

Defense counsel then asked Hatchett whether, at any time "throughout your life," he had ever heard a person express an intention to harm someone but actually intended only to "express[] displeasure at something the [person] has done" or joke about what the person did. The court sustained the prosecutor's objection that the question called for irrelevant matter. "Counsel, we're dealing with a case here, it's not relevant." Outside the presence of the jury, the court granted counsel's request to make a record of his intention to continue objecting to any speaking objections by the prosecutor. Counsel also stated he felt that

41

comments the court had made in ruling on previous objections were demeaning. In response, the court agreed with counsel that speaking objections were inappropriate and directed the prosecutor to state only a legal basis in support of any objection. With regard to counsel's second concern, the court stated: "Mr. Veale, the only reason I make comments is because I feel an attorney does not understand, because you or Mr. Jewett continue to do something after an objection has been sustained on a topic which has already been ruled upon, so to the extent that I feel you need the correction and need the clarification, I will do so to make sure you understand what the court's ruling was."

Preliminarily, defendant did not object to the majority of the prosecutor's speaking objections or otherwise request an assignment of misconduct in each instance. When defendant did object, he did not also request an assignment of misconduct or ask that the jury be admonished to disregard the prosecutor's remarks. Because an admonition would have cured any harm, defendant is not excused from complying with the objection requirement. Therefore, the claims were not preserved for appeal. (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 679.) In any event, the claim lacks merit.

We first address defendant's contention that the prosecutor's speaking objections denigrated defense counsel's integrity. "When a prosecutor denigrates defense counsel, it directs the jury's attention away from the evidence and is therefore improper. [Citation.] In addressing a claim of prosecutorial misconduct that is based on the denigration of opposing counsel, we view the prosecutor's comments in relation to the remarks of defense counsel, and inquire whether the former constitutes a fair response to the latter." (*People v. Frye* (1998) 18 Cal.4th 894, 978.) Here, the focus of the prosecutor's comment that counsel was being disingenuous was on counsel's attempt to elicit hearsay testimony, not on counsel's integrity, and it was not improper. (See *ibid*. [the prosecutor's

42

characterization of counsel's challenge to the witness's credibility as " 'ludicrous' and 'a smoke screen' " was not objectionable].)

Next, we reject defendant's contentions that the court "added to the problem" of the prosecutor's alleged improprieties by commenting that defense counsel appeared to be "rumor mongering." In stating that counsel appeared to be trying to elicit evidence of "rumors," the court was expressing its apparent frustration with counsel's repeated attempts to introduce evidence of complaints about RHA employees made long before defendant was hired at the agency. When counsel asked Hatchett whether, sometime "throughout [his] life," he had heard anyone state an intention to harm someone that he or she did not actually intend to act on, the court, with understandable exasperation, commented, "We're dealing with a case here." As the court later explained to counsel outside the presence of the jury, it expected counsel to abide by its rulings and would continue to remind counsel when it perceived counsel as needing "correction" and "clarification." The claim fails on the merits.

### (2) Shirail Burton

On cross-examination, Shirail Burton testified that while defendant was employed at RHA, the employees in the Conventional Housing division spoke cordially to Section 8 division employees, whereas Section 8 division employees expressed "animosity toward the Conventional [Housing] department." Defense counsel then asked the witness "was it true [that] you walked into the Section 8 [division] and said I am going to get the FBI in here and ha[ve] Toni [fired]." The prosecutor objected to the question as argumentative and vague as to time, and said, "Mr. Veale is trying to prejudice this jury with that last remark." The court sustained the objection, stating, "Seems to be. I am going to sustain the objection, counsel." Counsel did not comment on the prosecutor's speaking

objection, but requested an opportunity to demonstrate the relevance of the discord that allegedly existed between the Section 8 and Conventional Housing division employees before defendant was hired by the latter. Subsequently, in the absence of the jury, counsel made his offer of proof, and the court again ruled that the evidence was irrelevant: "[I]t's totally foreign to this particular litigation inasmuch as [defendant] was not present at any of the time[s] discussed by these event[s]."

Defendant forfeited his claim that the prosecutor committed misconduct by remarking that defense counsel was trying to prejudice the jury against Burton by failing to object and request an assignment of misconduct. In any event, the comment was directed at the nature of the question being asked, and did not impugn counsel's integrity. Further, that the court appeared to agree with the prosecutor's comment that counsel was trying to bias the jury against Burton may have been improper, but we disagree that the brief, fleeting remark gave the jury the impression that the court condoned the accusatory nature of the objection.

### (3) Toni Lawrence

On direct examination, defense counsel asked Toni Lawrence a series of questions related to her observations of Talley's interactions with the employees she supervised. When the court sustained the prosecutor's objection based on "hearsay," "[g]ossip," and "[r]umor," counsel did not respond. Here, defendant claims the prosecutor's speaking objection constituted prejudicial misconduct. By failing to object, however, defendant forfeited the claim on appeal. In any event, the isolated, stray remarks were harmless.

### c. Defense witness Celia Gardner

Defendant contends the prosecutor improperly attempted to impeach defense witness Cecilia Gardner, a former employee of RHA, by asking her

whether she was aware of the existence of a felony bench warrant for her arrest on charges of grand theft, perjury, and check fraud.

After Gardner initially denied knowledge of an outstanding warrant for her arrest on the above noted charges, defense counsel objected and the prosecutor specifically asked the witness whether she had fraudulently misappropriated a "social services check." The court interrupted and indicated the witness should be advised of her rights under *Miranda v. Arizona* (1966) 384 U.S. 436. When the prosecutor commenced to do so, counsel objected. The court excused the jury and conducted a hearing on the matter. The prosecutor informed the court that "we have very conclusive evidence showing on May 5th, 1996, that this witness cashed a Social Services or Social Security check, she left her thumb print on that check. [¶] The following day she filed an application under penalty of perjury that the check had been lost. The check was then replaced and on May 10th, she then cashed that check. [¶] A felony complaint charging check fraud, perjury, and grand theft has been filed against her. There is a $30,000 bench warrant for her arrest. It's that incident that I want to inquire into." The court stated that it would "take the [prosecutor] at his word that there is a complaint filed," and advised the witness of her rights.

After briefly describing his intent to offer the evidence to establish the witness's bias, the prosecutor conceded that he did not have independent proof that Gardner had knowledge of the warrant "other than this is an incident that happened four months ago." The prosecutor represented that the warrant had issued two weeks earlier and "FA" appeared on its face, which he interpreted as "failure to appear." The court responded that it was unclear whether Gardner was aware of the warrant, whether the warrant ordered her to appear in court, or whether she failed to do so. The court did not rule explicitly on defense counsel's objection, but gave the prosecutor the option to pursue the matter in rebuttal. The

45

prosecutor declined to do so. The court twice admonished the jury to disregard the evidence of the outstanding warrant.

Preliminarily, we disagree with the People that defendant has forfeited the claim of misconduct. Defense counsel's objections to the admissibility of the evidence for impeachment purposes sufficed to preserve this issue for appeal. (See, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1186.) Nonetheless, the claim fails on the merits.

A prosecutor may not ask questions of a witness suggesting facts harmful to a defendant without a good faith belief that such facts exist. (*People v. Bolden*, *supra*, 29 Cal.4th at p. 562.) Fraud is a crime of moral turpitude. (*People v. Cadogan* (2009) 173 Cal.App.4th 1502, 1514.) Under *People v. Wheeler* (1992) 4 Cal.4th 284, 295-296, evidence of nonfelonious conduct reflecting moral turpitude may be admitted for purposes of impeachment. (See also Evid. Code, § 788.) The proponent of the impeachment evidence must have a good faith basis for asking the question. (*People v. Young*, *supra*, 34 Cal.4th at pp. 1185-1186; *People v. Bolden*, *supra*, 29 Cal.4th at p. 562.)

Here, the court did not find the prosecutor lacked a good faith belief for his question concerning the warrant. To the contrary, the court accepted as true that the prosecutor was reading from a complaint filed approximately four months earlier charging Gardner with fraud, and impliedly found the prosecutor had a good faith basis in asking about the charge. We find nothing in the record from which to conclude the court's decision was an abuse of discretion. Therefore, to the extent the prosecutor sought to impeach the witness with evidence that she had engaged in the alleged fraud, we cannot say the prosecutor acted improperly.

Further, even if the prosecutor should not have questioned Gardner about the warrant, the misconduct was harmless. The witness admitted that she was suspended from the RHA for improperly giving individuals priority on the waiting

46

list for housing, and was ultimately terminated because she was found in possession of laundry tokens that had been stolen from RHA. Finally, the court admonished the jury to disregard any mention of the arrest, and we presume it followed the court's instructions. There is no reasonable probability that any misconduct affected the outcome.

### d. Cross-examination of Dr. Walser

On cross-examination, the prosecutor questioned Dr. Walser about her consideration of the reports prepared by Drs. Kincaid, and Wilkinson, in forming her opinion of defendant's mental state at the time he killed the victims. Defense counsel had consulted with Drs. Kincaid and Wilkinson before trial, but did not call them to testify. Defendant contends that the prosecutor's questions, discussed below, were argumentative and that the trial court abused its discretion in permitting the prosecutor to pose them. We disagree.

Defendant complains about the following portion of cross-examination: "[The prosecutor:] Essentially the three of you were getting your 2 [*sic*] stories together before you formalized in a report, is it not? [¶] [Defense counsel:] That's truly objectionable. I object to — [¶] [The prosecutor:] It's a question. [¶] THE COURT: I will overrule the objection. [¶] You could answer the question if you have an answer. [¶] [The prosecutor:] You were all getting your diagnoses, your opinions, whatever you want to call it, together so everybody lined up saying basically the same thing before any of you wrote a report; isn't that true? [¶] [Dr. Walser:] I could say very clearly to that that I came to my own opinions independently."

Defendant also finds fault with the following portion of the prosecutor's recross-examination: "[The prosecutor:] So the points that I've tried to bring up during a fairly lengthy cross-examination at every opportunity you've taken, you

47

have taken, described [] a defensive posture to protect your opinion, right? [¶] DR. WALSER: No, I feel like I'm trying to explain what I understand. And at times the questions have only offered me or tried to have me offer only a part of it and it's an inaccurate representation. [¶] What I am dedicated to is making sure that it's my opinion and the test data and everything that I have done are represented accurately. [¶] . . . [¶] [The prosecutor:] When [defendant] actually went about the process of killing people, he actually did it very efficiently, didn't he? [¶] [Defense counsel:] That's argumentative. Argumentative, judge, objection. [¶] THE COURT: Overruled. [¶] [The prosecutor:] It was actually a very efficient job in his—job in his mind, it was to kill people, he actually did it in a very organized and efficient way, didn't he? [¶] DR. WALSER: I guess I would have to think about the word efficient."

"An argumentative question is designed to engage a witness in argument rather than elicit facts within the witness's knowledge." (*People v. Guerra, supra*, 37 Cal.4th at p. 1125.) Here, Dr. Walser testified that she considered the pretrial evaluations by Drs. Wilkinson and Kincaid in forming her opinion that defendant was psychotic and experiencing disorganized thinking when he shot the victims. The questions quoted above, though barbed and accusatory at times, were not inappropriate because they were designed to elicit additional facts to clarify the degree to which Dr. Walser relied on or was influenced by the reports of Drs. Wilkinson and Kincaid. "An expert may be cross-examined regarding the subject to which his testimony relates, the matter on which he bases his opinion, and the reasons for his opinion." (*People v. Bell* (1989) 49 Cal.3d 502, 532; see also Evid. Code, § 721, subd. (a).) In addition, cross-examination of Dr. Walser on whether defendant killed Talley and Garcia in an efficient manner properly probed her opinion that defendant was experiencing disorganized thinking at the time he shot the victims. No misconduct occurred.

48

### e. The prosecutor's remarks at the bench

Defendant contends that the court permitted the prosecutor to make inappropriate remarks "in earshot of the jury." The claim fails.

During counsel's redirect examination of Dr. Walser, defense counsel informed the court that he might have to testify regarding a matter he discussed with defendant. Counsel said he had made no notes of the communication and provided no discovery on the matter to the prosecution. The prosecutor responded, "I look forward to the opportunity to cross-examine [defense counsel] because I assume he will be laying a foundation."

Outside the presence of the jury, defense counsel complained that the prosecutor "[stood] back two or three feet" and spoke "so that the Court could hear it . . . as well as everybody else in the [court]room" and that "what [the prosecutor]'s doing is trial lawyering, but he's not doing it fairly." Counsel also said he had previously complained that the prosecutor spoke loudly at times, the prosecutor did not "play by the rules and play fairly," and the prosecutor prefaced each question with argument. The prosecutor denied he had raised his voice as he stepped away from the bench.

The court acknowledged that the prosecutor made the above statement as he stepped away from the bench but noted that he was "facing away from the jury." The court stated that it did not detect any difference in the tone of the prosecutor's voice but accepted the fact that it "may have carried further."

The claim lacks merit. Defendant offered no evidence that the jury actually heard the prosecutor's remark, and he therefore cannot show prejudice. Even assuming the jury heard the comment, they would have appreciated it for what it was, that is, simply a display of an attorney's competitive spirit during adversarial litigation. Further, in making the remark, the prosecutor neither directly nor inferentially questioned counsel's motives or integrity. (*People v. Price* (1992) 1

Cal.4th 324, 448.)  There is no reasonable probability that the remark could have affected the verdict.

### f. State of mind evidence

Defendant contends that the trial court erred in overruling his objections to the admission of Rodney Ferguson's testimony that he saw defendant nod while sitting in the patrol car after the shootings and Robinson's, Garcia's, and Burton's testimony that they feared defendant.  On appeal, defendant maintains the evidence was irrelevant and the court's failure to sustain these objections "discouraged other appropriate objections and, in cumulative effect, denied [defendant] due process of law."  We reject the claim.

Prosecution witness Ferguson was employed by the City of Richmond when defendant worked in the Employment and Training Department.  Ferguson was acquainted with defendant and testified that he had a conversation with him about two hours before the murders.  Ferguson said defendant told him that he was afraid he would be fired and that he felt "his boss" was "doing him in" and "stabbing him in the back."  Defendant turned his back to Ferguson and made a stabbing motion. Defendant then said that he could "shoot" his boss for "doing him in."  After the shootings, Ferguson saw defendant in custody in the backseat of a police car, and defendant turned his head toward Ferguson and nodded.  Ferguson interpreted this to mean, "[Y]ou know, I said I was going to do it and I did it."  Defense counsel objected that the testimony was irrelevant and speculative.  The court sustained the objection except to the extent that Ferguson testified that he saw defendant nod.  The prosecutor then asked him whether he thought that by nodding, defendant was alluding to their earlier conversation.  Over counsel's objection that the question called for irrelevant and speculative

50

testimony, Ferguson agreed that at that moment, he thought of his conversation with defendant.

On direct examination, Janet Robinson testified without objection that, four days before the murders, defendant told her, "[s]ometimes, you know, I feel like doing a 101 California Street in here" and that she told Garcia about defendant's threats. Robinson also testified that she feared defendant would kill her if he learned she had told anyone of his threats. Over defense counsel's hearsay objection, Robinson stated that both before the day defendant made the threat and after she reported the threat to Garcia, Garcia told her that she feared defendant "was going to kill her [(Garcia)]."

On direct examination by the prosecutor, Shirail Burton testified over a relevance objection that after she learned on the day of the murders that defendant was to be fired in the afternoon, she was "very afraid, very nervous" throughout the day.

Defendant contends that evidence of Ferguson's interpretation of defendant's nod while he sat in the backseat of the patrol car, and of Robinson's, Garcia's, and Burton's fear of defendant, was irrelevant, and that the court abused its discretion in overruling defense counsel's objections to admission of this evidence. As a consequence, defendant maintains that his attorney was discouraged from making "other appropriate objections."

"A judgment will not be reversed on grounds that evidence has been erroneously admitted unless 'there appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so *stated as to make clear the specific ground of the objection or motion . . . .'* (Evid. Code, § 353, subd. (a), italics added.) Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering

51

the evidence to cure the defect in the evidence." (*People v. Mattson* (1990) 50 Cal.3d 826, 853-854.)

As discussed above, with respect to the admission of Robinson's testimony, defendant did not object on relevance grounds. Therefore, his claim that the court erred in overruling defense counsel's objection is forfeited on appeal. Defendant's remaining contentions that the court erred by overruling counsel's objections regarding the admission of Ferguson's and Burton's testimony are preserved for review but lack merit.

"Evidence Code section 210 defines 'relevant evidence' as 'evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact *that is of consequence to the determination of the action*.' (Italics added.)" (*People v. Steele* (2002) 27 Cal.4th 1230, 1263.) "Evidence is relevant when no matter how weak it is it tends to prove a disputed issue." (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843.)

In this case, Ferguson's testimony that when he saw defendant nod his head, he thought about defendant's statement that he could "shoot" his boss was relevant to show premeditation. Under the circumstances, it was not overly speculative for Ferguson to give his interpretation of defendant's nonverbal communication, and therefore the evidence was admissible. The court did not abuse its discretion in overruling defendant's objection on that ground.

Next, we agree that evidence Burton was scared after learning defendant would be fired was not probative of any issue of fact. Nonetheless, any error in admitting the evidence, considered individually or collectively, was harmless given the overwhelming evidence that defendant premeditated and deliberated the murders. Defendant repeatedly told his coworkers months in advance that he intended to kill anyone who tried to fire him. He told Robinson he would spare

52

her life, reminded her of his promise after he shot Talley and Garcia, and told police that he did not shoot Robinson because she had not "screwed with him." Defendant bragged about going to the shooting range the evening before the murders. Eyewitnesses described how he hunted down the victims and fired multiple shots execution style into each victim. Defendant admitted he looked for a third victim. Weeks before the murders, he purchased a .380-caliber handgun. The day after the killings, police recovered from defendant's apartment an empty box of .380-caliber ammunition, targets with bullet holes, and a book entitled "Madness in Criminal Law."

We also reject defendant's derivative claim that the court's rulings on defense counsel's objections to the admission of this evidence deterred counsel from making additional proper objections and "in cumulative effect" deprived him of due process. The court *sustained* these objections in part and, at times, sustained other defense objections. Nothing in these or other rulings would have deterred a reasonable attorney from making appropriate objections, and nothing in the record suggests that counsel was actually deterred.

Finally, defendant perfunctorily contends the evidence was inadmissible because the prosecutor offered it for the improper purpose of appealing for sympathy for the victims. (See *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 ["[A]n appeal for sympathy for the victim is out of place during an objective determination of guilt."].) Because defense counsel failed to object to the admission of any of the evidence on this ground, the claim is forfeited on appeal. Defendant also fails to persuade us of its merits.

### g. *Deliberation requirement*

During guilt phase closing argument, the prosecutor defined the "deliberation" element of first degree murder as follows: "Deliberation is in

53

essence . . . . It's the weighing and considering. It's the thinking about am I going to do it? Am I not going to do it? Okay? Which precedes the decision to kill." The prosecutor urged that, among other evidence, Ferguson's testimony that defendant said, "I could shoot her [(Talley)]" and Ferguson's characterization of defendant's behavior as "like he was talking to himself. . . . like a self-query" was sufficient proof that defendant deliberated the murders. Here, defendant contends that the prosecutor misstated the definition of "deliberation" by omitting the requirement that the jury find beyond a reasonable doubt that defendant also weighed and considered the reasons *against* killing the victims. As a result, the jury assertedly applied an erroneous definition of this element of first degree murder, rendering the verdicts constitutionally invalid. For the reasons stated below, the claim lacks merit.

" '[D]eliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1080; *People v. Bender* (1945) 27 Cal.2d 164, 183.)

Defendant asserts that when the prosecutor paraphrased the deliberation requirement for first degree murder as, "[i]t's the thinking about am I going to do it. . . [a]m I not going to do it," he erroneously omitted the requirement that the killer consider the reasons *against* killing. Defendant maintains that absent this specific thought process, one has not engaged in "deliberation." The claim is forfeited, however, because defendant made no objection, which could have easily cured any harm.

Even if the prosecutor's paraphrase did not refer specifically to the weighing and consideration of the reasons *against* making a particular choice, the prosecutor correctly referred to this requirement elsewhere in his argument. He

54

told the jury that "deliberation is . . . the thought and weighing of considerations for and against a proposed course of action." Thereafter, he argued, "[Defendant] talks to [Rodney] Ferguson and what is he, reflective and pensive. These are not descriptions of a person who is enraged. These are not descriptions of a person who is suffering from passion. These are descriptions of a person who is in deliberation. Who is in reflection. Who is weighing and considering the choices for and against and he has the means readily at hand at the time that he makes that statement." Further, the court properly instructed the jury on the law, as follows: "The word 'deliberate,' which relates to how a person thinks, means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." (See CALJIC No. 8.20.) We presume the jury followed this instruction, and therefore, any misstatement was harmless.

### h. The prosecutor's closing argument

Defendant claims that the prosecutor improperly appealed to the jury's sympathy and passion for the surviving RHA employees when he (1) summarized the testimony of certain witnesses and (2) commented on, and displayed photographs of, the shoes left behind by the coworkers who fled the building during defendant's rampage. Defendant also contends the prosecutor committed misconduct by commenting on defense counsel's decision not to call Drs. Kincaid and Wilkinson to testify about the results of defendant's Rorschach test results and MRI, respectively.

Preliminarily, the claim is not preserved for appeal because defendant did not object during argument and request an admonition. In any event, the claim lacks merit.

55

"A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1251; *People v. Fields* (1983) 35 Cal.3d 329, 362-363.) "[A]n appeal for sympathy for the victim[, however] is out of place during an objective determination of guilt." (*People v. Stansbury*, *supra*, 4 Cal.4th at p. 1057.)

Here, defendant complains that the prosecutor improperly asked the jury to sympathize with certain witnesses when he summarized their testimony and commented that they were also victims of defendant's massacre. For example, the prosecutor identified RHA employee Barbara Walther as a victim. Walther testified that after the shootings, she shook Garcia and told her that "she could get up now," and Garcia did not move.

The prosecutor's characterization of Walther as a victim was not an improper appeal to the jury's sympathy. The prosecutor was reminding the jury of the unique accounts of the shooting spree offered by those who survived. The prosecutor's similar characterizations of other witnesses' testimony were not improper on this basis.

Next, defendant contends the prosecutor improperly appealed to the sympathies of the jury when he stated that the victims' shoes recovered at the crime scene were "a reflection of the people who chose to wear them." For example, the prosecutor commented that Talley's shoes brought to mind that she was a "gregarious, outgoing, stylish person," "a black woman, single parent, who worked her way up just on her own guts and determination and intelligence to get where she was" and that Garcia's shoes showed the "youthful" style of someone "trying to get ahead and . . . do the right thing."

Even assuming the statements were improper, they were harmless. The remarks about the victims' shoes were relatively brief and isolated. Defendant, moreover, did not deny shooting the victims and only claimed he did not premeditate and deliberate the killings. The evidence, however, overwhelmingly established both premeditation and deliberation. (See discussion, pt. II.B.1.f, *ante*.) Therefore, it is not reasonably probable a result more favorable to defendant would have been reached absent the prosecutor's fleeting appeal to the jury's sympathy for the victims.

Defendant also contends the prosecutor improperly argued that defense counsel attempted to mislead the jury in calling only Dr. Walser to testify about defendant's MRI results. Specifically, after referring to portions of their reports, the prosecutor suggested Drs. Kincaid and Wilkinson would have been called to testify if they "could even offer an outside possibility that [the detected abnormalities] might have an effect on behavior. . . . [¶] But, no, what we're going to do is put a neuropsychologist who didn't even know how to read an MRI to try to leave you with the impression now [*sic*] this variant in the brain has something to do with behavior."

"A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." (*People v. Hill*, *supra*, 17 Cal.4th at p. 832.) "[H]arsh and colorful attacks on the credibility of opposing witnesses[, however,] are permissible. [Citations.] Thus, counsel is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent 'lie.' " (*People v. Arias* (1996) 13 Cal.4th 92, 162.) But "[i]f there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury,

57

misconduct would be established." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302.)

Here, the prosecutor properly argued that the evidence established Dr. Walser's evaluation and test results were uncorroborated, and suggested to the jurors that had other evidence in support of her opinion existed, it would have been presented. The argument did not impugn defense counsel's integrity. There was no misconduct.

### 2. *Defense mental health expert testimony*

On direct and redirect examination of defense expert Dr. Walser, defense counsel asked whether the evidence of defendant's threats to do a "101 California" indicated he "thought" about committing a "101 California" before the murders. The prosecutor objected that counsel was improperly trying to elicit the expert's opinion on an ultimate question of fact for the jury—i.e., whether defendant killed the victims with premeditation and deliberation, an element of the crimes charged. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1143; CALJIC No. 8.20) Defense counsel explained that he intended to have the expert distinguish between the existence of a thought and these mental states. The trial court sustained the objection.

Defendant contends the trial court erred in precluding defense counsel from posing the question because the thought of committing homicide does not necessarily result in the formation of premeditation and deliberation. Specifically, he asserts that, although the existence of prior thoughts about killing may evince premeditation, evidence of such thoughts, standing alone, is not dispositive on the issue of whether defendant killed with the required specific intent because the jury must also find that the premeditation and deliberation preceded the formation of

the intent to kill. (See *People v. Stitely* (2005) 35 Cal.4th 514, 543.) We find no abuse of discretion.

"Section 28, subdivision (a) provides that evidence of mental illness 'shall not be admitted to show or negate the capacity to form any mental state.' Subdivision (b) of section 28 states that as a 'matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action . . . .' Section 29 prohibits expert witnesses from directly stating their conclusions regarding whether a defendant possessed a required mental state. It provides, '[i]n the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states . . . . The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 662.) A trial court's decision to admit or exclude expert testimony is reviewed for abuse of discretion. (*Id*. at p. 663.)

"Murder that is premeditated and deliberated is murder of the first degree." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.) The very definition of "premeditation" encompasses the idea that a defendant thought about or considered the act beforehand. " ' "[P]remeditation" means thought over in advance,' " and " ' "[d]eliberation" refers to careful weighing of considerations in forming a course of action.' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812, quoting *People v. Koontz*, *supra*, 27 Cal.4th at p. 1080.) "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely*, *supra*, 35 Cal.4th at p. 543.) The court instructed the jury that the "word 'deliberate,' which relates to how a person thinks, means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the

59

proposed course of action. [¶] "The word 'premeditated' relates to when a person thinks and means considered beforehand. One premeditates by deliberating before taking action." (See CALJIC No. 8.20.)

The trial court acted within its discretion in finding that the question at issue here essentially asked the expert to provide an opinion about the required mental state (premeditation and deliberation) and thus was improper under section 29. (See also *People v. Rangel* (1992) 11 Cal.App.4th 291, 298 [trial court properly excluded psychiatrist's expert testimony that " 'in that state of intoxication, the person is not able to think rationally and deliberate, which means weigh consequences, think about things in logical sequences,' " on the issue whether the defendant premeditated and deliberated the killing].)

Next, defendant contends that the trial court's explanation that defense counsel's question "called for one of the elements of the offense" improperly "equated" homicidal thought with premeditation and deliberation and removed from the jury's determination the "vigorously disputed" question whether the evidence of his homicidal thoughts constituted premeditation and deliberation. We disagree.

"A trial court may comment on the evidence (Cal. Const., art. VI, § 10), but such comments 'must be accurate, temperate, nonargumentative, and scrupulously fair.' " (*People v. Sturm* (2006) 37 Cal.4th 1218, 1232.) In *Sturm*, we held that the trial judge prejudicially erred by stating "that premeditation was a 'gimme' and that the issue of premeditation was 'all over and done with' " (*Ibid.*) The comment unfairly bolstered the prosecutor's argument that the murders were premeditated and also undermined the defense strategy that the murders were committed under the influence of drugs and therefore were not premeditated. (*Ibid.*)

60

In this case, the court's brief and neutral remark expressly affirmed that the question whether defendant premeditated and deliberated the murders was for the jury to decide. Although the court also impliedly, and correctly, informed the jury that defendant's "101 California" threats could be considered evidence of these elements, by doing so it did not, as defendant contends, improperly tell the jury that evidence of the threats constituted sufficient proof of the elements. Additionally, unlike *Sturm*, in which the erroneous comment was left uncorrected, the jury subsequently was properly instructed under CALJIC No. 8.20 and would not have misunderstood the court's comments as removing the issue of premeditation and deliberation from its purview.

Accordingly, the claim fails.

### 3. *Testimony of Radiologist William Hoddick*

Defendant contends that the court erred by admitting over objection the radiologist's testimony that, in essence, the presence of premature fossa on defendant's brain white matter would not affect his behavior because the witness was not qualified to render such an opinion. (Evid. Code, § 720.) The error was prejudicial, he argues, because the radiologist's opinion discouraged or precluded the jurors from considering Dr. Walser's testimony that defendant's psychological and neuropsychological test results indicated he was mentally impaired when he shot the victims. The contention is without merit.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) " 'We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion. [Citation.] Such abuse of discretion will be found only where " 'the evidence shows that a witness *clearly lacks*

61

qualification as an expert . . . .' " [Citation.]' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1062-1063.)

At the time of trial, Dr. Hoddick had been in practice since 1979, specializing in diagnostic medical imaging, and had been board certified since 1983. He was on active staff at John Muir Medical Center and Mount Diablo Medical Center and also was the Medical Director of Contra Costa County MRI in Pleasant Hill. Dr. Hoddick had been a member of the faculty at the University of California, San Francisco, Medical Center since 1984 and had published widely in the area of radiology. His research had won national prizes. Dr. Hoddick had testified as an expert in medical imaging in at least 12 trials, three or four of which involved criminal matters. He explained that the MRI utilizes "a very specialized camera for looking inside the human body to evaluate structural anatomy inside the body" that "uses two physical properties[,] . . . [a] high frequency image and radio frequency wave [] [that are] used . . . with the MRI to take exquisitely detailed pictures." Dr. Hoddick stated that he evaluates MRI results by reviewing the images produced to determine "what's going on inside the body."

Here, defendant acknowledges that Dr. Hoddick was qualified to testify as an expert in diagnostic medical imaging but maintains he was not competent to opine whether the abnormalities he identified had any impact on defendant's behavior. Specifically, he asserts that Dr. Hoddick did not establish that his experience and training in diagnostic medical imaging enabled him to opine whether fossa abnormalities such as those he detected on defendant's MRI results could affect human behavior. Based on our review of the record, we agree with defendant that the prosecution failed to demonstrate the radiologist was qualified under Evidence Code section 720 to testify regarding the effect of fossa abnormalities on human behavior, a subject that is clearly beyond a juror's common knowledge. Evidence of this nature is ordinarily admitted through the

testimony of a qualified psychiatrist or neuropsychiatrist. (See, e.g., *People v. Danks* (2004) 32 Cal.4th 269, 286-287 [testimony of neuropsychiatrist offered to show that the defendant's brain abnormalities affected his impulse control].) Because Dr. Hoddick's competence to testify on this particular subject was not established, the trial court erred in admitting his testimony to the extent he opined defendant's premature fossa did not affect his behavior.

Nonetheless, "[t]he erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 247, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) Here, the erroneous admission of Dr. Hoddick's testimony was harmless.

As stated, defendant's sole defense was that due to a myriad of mental disorders, he did not premeditate and deliberate the murders. Dr. Walser, the defense neuropsychologist, testified to this effect and stated that in forming her opinion, she relied extensively on the results of her psychological and neuropsychological evaluation of defendant and the results of the MMPI-2. Dr. Walser did not rely heavily on the brain abnormalities in forming her opinion regarding defendant's psychopathology, and hence Dr. Hoddick's testimony that the fossa had no effect on defendant's behavior would not greatly have affected the jury's assessment of her opinion. Further, as discussed in part II.B.1.f, *ante*, the prosecution's evidence that defendant premeditated and deliberated the murders was overwhelming. Accordingly, we conclude that it is not reasonably probable that the erroneous admission of the prosecution's expert testimony affected the judgment.

### 4. Application of exclusionary rules

Defendant contends that several evidentiary rulings involving the testimony of the defense expert, Dr. Walser, and the People's experts, Dr. Berg, Dr. Hoddick, and Dr. Peterson, reflected pro-prosecution bias on the court's part. Assertedly, the court's rulings, each of which we address below, "were less then [sic] evenhanded," and facilitated the prosecution's presentation of its case. We disagree.

"[A] trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review. [Citations.] [¶] On appeal, we assess whether any judicial misconduct or bias was so prejudicial that it deprived defendant of ' "a fair, as opposed to a perfect, trial." ' " (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1112.)

Preliminarily, because defense counsel did not complain or otherwise object during trial that the evidentiary rulings discussed below reflected judicial bias, defendant forfeited the claim on appeal. (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1112.) We also note that the court made many rulings in favor of defendant during the course of the trial. Due to the nature of the appellate process in criminal cases, those rulings are not before us on appeal and we do not review or, generally, even mention them. But the fact that on appeal we discuss only rulings against defendant does not mean the court's rulings were other than evenhanded. (See *People v. Jones* (2011) 51 Cal.4th 346, 376-377.)

### a. Dr. Walser's qualifications to opine on brain tissue abnormalities

Defendant contends that the court applied different standards in qualifying Dr. Walser, the defense expert psychologist, and Dr. Hoddick, the prosecution's expert radiologist, to opine whether the abnormalities detected on defendant's MRI could affect his behavior.

As discussed above, whether a witness qualifies as an expert under Evidence Code section 720, subdivision (a), comes within the trial court's discretion. (*People v. Wallace*, *supra*, 44 Cal.4th at pp. 1062-1063)

During the defense case-in-chief, defense counsel sought to qualify Dr. Walser as an expert in the fields of forensic psychology, neuropsychology, psychology, and clinical psychology, and offered her testimony on the issue of defendant's mental state during the shooting spree. After counsel elicited information about her education, skills, and experience in each subject, the prosecutor accepted the court's offer to voir dire the witness. He asked Dr. Walser additional questions about her qualifications in each of the subjects identified. She stated that she administered the Halstead-Reitan test, which is specifically designed to detect neurological brain damage, to in-custody defendants on five to 10 occasions during the five years preceding defendant's trial and on two or three occasions during the preceding two years. In the six years preceding defendant's trial, Dr. Walser testified for the defense in three to five criminal trials. During one or two of those trials, she testified about the results of the Halstead-Reitan test after having personally administered the test. The court found Dr. Walser qualified to offer expert testimony in the areas of neuropsychology, psychology, and clinical psychology.

Thereafter, on direct examination, Dr. Walser testified that the results of neuropsychological tests she administered to defendant indicated mild impairment, and that this level of impairment would have a noticeable effect on a person's personality and behavior. Before Dr. Walser tested defendant, she had been provided an oral report of defendant's EEG results and MRI findings. The EEG results indicated there was a "questionable" abnormality in the left temporal region of defendant's brain, and the MRI findings indicated focal atrophy or a small cyst in the posterior temporal lobe. When defense counsel asked Dr. Walser

65

whether brain abnormalities could cause problems with brain function, the prosecutor objected that she was not qualified in the fields of neurology and radiology. The court permitted the parties to voir dire Dr. Walser in these areas, and thereafter accepted her qualifications to testify to the MRI and EEG results. Dr. Walser stated the results of defendant's EEG and MRI supported her conclusion that defendant suffered from organic brain damage, although she also clarified that these results were not essential to her conclusion.

As discussed in the preceding part, defendant objected to Dr. Hoddick's qualification to opine whether the abnormalities he detected on defendant's MRI could affect defendant's behavior. The court overruled the objection without comment, and Dr. Hoddick testified that the abnormalities would have no effect on defendant's behavior. We concluded that the court erred in overruling the objection. Nonetheless, nothing in the record suggests its manner of determining the qualifications of either expert was unfair or biased.

### b. Nontestifying experts

The pathologist who performed the autopsies on the victims in this case, Aaron Lipton, was unavailable to testify at trial. During the prosecution's case-in-chief, over objection, Dr. Peterson was permitted to testify about each victim's cause of death based on the contents of Dr. Lipton's autopsy reports.

During presentation of the defense case, counsel attempted to elicit testimony from Dr. Walser concerning Dr. Caldwell's analysis of defendant's MMPI-2 and "Rey-15-Item Test" results. Dr. Caldwell interpreted and analyzed the MMPI-2 results, explained why the results were valid, and concluded that the results of the "Rey-15 Item Test" showed no evidence defendant was malingering. The prosecutor objected to admission of the testimony under *People v. Campos* (1995) 32 Cal.App.4th 304, 308. *Campos* held that "[o]n direct

examination, the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion," but "[the] expert witness may not, *on direct examination*, reveal the content of reports prepared or opinions expressed by non-testifying experts." (*Ibid.*, italics added.) The trial court sustained the prosecutor's objection in part, barring Dr. Walser from revealing the contents of Dr. Caldwell's report or opinions expressed by Dr. Caldwell as they may have related to or affected her evaluation of defendant.

On appeal, defendant contends the trial court's rulings "created imbalance in expert testimony, and reduced the coherence of the defense." We disagree. Assuming the rulings were unbalanced, the prosecution gained no significant advantage thereby. In part II.B.8, *post*, we discuss defendant's contention that Dr. Peterson's testimony was admitted in violation of his Sixth Amendment right to confrontation and conclude his testimony had little or no significance in this case.

### c. Evidence of disorganized thinking

In surrebuttal, defense counsel asked Dr. Walser whether "on the Rorschach test Michael Pearson . . . tested positive for disorganized thinking." Defendant contends the court exhibited bias when it sustained the prosecutor's objection that the question called for testimony cumulative of that of Dr. Walser's testimony on direct examination because the court ruled on the objection *before* it asked counsel whether the expert had indeed already testified on this point. Defendant asserts that evidence of defendant's disorganized thinking, as suggested by the Rorschach test results, was elicited only on counsel's cross-examination of the prosecution's mental health expert, Dr. Berg. To the contrary, as counsel conceded during the hearing on this matter, he developed this testimony on direct examination of Dr. Walser. Dr. Walser testified, for example, that the results suggested defendant had a "coping deficit" and explained that people with such a

deficit are "easily disorganized by stress" and that in this context, "disorganized" means, among other things, the person "may not be able to think or think clearly." Defendant's suggestion of bias is entirely unfounded. The court did not abuse its discretion in excluding the testimony as cumulative.

### d. Dr. Berg's qualification as an expert in workplace violence

Defendant contends the court was biased because it did not address his objection that the prosecution's proposed expert testimony from Dr. Berg concerning workplace violence was irrelevant on the issue of defendant's state of mind.

Here, the expert testified he had evaluated over two dozen employees for their potential for violence in the workplace environment. He testified that defendant's conduct at work on the day of the murders was relevant to his state of mind at the time of the murders, and that his experience in evaluating others who have committed violence in the workplace would assist him in diagnosing defendant's personality. Defendant does not establish why or how the testimony was irrelevant. The claim therefore fails.

### e. Permissible scope of expert testimony regarding defendant's state of mind

Defendant contends the court unfairly assisted the prosecution in presenting its case by permitting the People's mental health expert, Dr. Berg, to opine about ultimate facts relating to defendant's mental state at the time of the murders, while precluding his own expert, Dr. Walser, from providing similar testimony. As explained below, defendant failed to preserve most of his arguments for appeal, and in any event, the testimony of the two experts differed in ways that affected their admissibility under section 29.

Under section 29, an expert may testify "about a defendant's mental illness, mental disorder, or mental defect," but "shall not testify as to whether the

defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged." Section 28, subdivision (a) precludes evidence showing diminished capacity, although it permits evidence of mental disease to be admitted "solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." Subdivision (d) of section 28, however, recognizes the court's "discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."

Contrary to defendant's assertions, on numerous occasions Dr. Walser offered opinions that went to defendant's state of mind at the time he shot the victims. When defense counsel asked the expert what was "disorganized" about defendant's attempt to talk further with Talley about the reasons for his termination, Dr. Walser responded: "Well, that's not. It's probably an appropriate thing to do." She then gratuitously added, "But he was—I think he was escalating in terms of the stress he was experiencing. When that was not fulfilled and he didn't have that opportunity and he felt very wrong, then he—then it tipped the balance and he became —." Counsel then asked Dr. Walser a series of questions about defendant's "101 California" statements and specifically whether, sometime before the day of the murders, defendant was "thinking about just what he said, doing a 101 California?" As we concluded in part II.B.2, *ante*, this question, like the question about any disorganization defendant may have experienced, asked the expert to opine directly about defendant's state of mind at the time of the offense, a question within the jury's exclusive province. (See *People v. San Nicolas*, *supra*, 34 Cal.4th at p. 663 [the trial court did not err by excluding forensic psychiatrist's opinion relating the concept of "spillover rage" to the defendant's

69

mental state at the time of the crimes].)  Thus, the trial court properly sustained the prosecutor's objections to these questions.  The court also properly sustained prosecutorial objections to the following portions of Dr. Walser's testimony on the same ground:  (1) "[defendant] seemed to be [in] a reactive kind of state, rather than . . . cold and calculated"; (2) "[At the time of the crimes, defendant] didn't seem to know what he was doing"; and (3) "defendant's impairment [at the time of the commission of the crimes] definitely needs to be taken into consideration here. It's part of why he couldn't handle the stress he was under."

On the other hand, the court properly permitted the prosecution's expert, Dr. Berg, to interpret defendant's comment, "I ain't no joke," made before and after shooting Talley, as expressing "anger," "retribution," and "revenge." "[S]ections 28 and 29 in fact leave an expert considerable latitude to express an opinion on the defendant's mental condition at the time of offense, within the confines, of course, of its twin prohibitions: no testimony on the defendant's capacity to have, or actually having, the intent required to commit the charged crime." (*People v. Cortes* (2011) 192 Cal.App.4th 873, 910, citing *People v. Coddington*, *supra*, 23 Cal.4th at p. 583.)  Dr. Berg's testimony properly related to defendant's general mental condition during his killing spree and did not express an opinion on his criminal intent when he shot the victims.  In any event, defense counsel's failure to object forfeited any claim with regard to Dr. Berg's interpretation of defendant's "I ain't no joke" comment.

For the same reason, under sections 28 and 29, Dr. Berg was permitted to testify that defendant's conduct could be explained by the termination of his employment, and that what he "believed was going to be happening to him for weeks before [the murders]" could not be explained by "anything delusional or hallucinatory."  The expert did not describe defendant's mental state at the time he shot the victims, but rather, his diagnosed mental condition.  And while defense

counsel initially objected to admission of this testimony, his claim is forfeited because the court admitted the evidence subject to a motion to strike, which counsel never made. Indeed, counsel was even amenable to opening up this area, suggesting, "If you want to go there, that's all right with me . . . ."

Further, the court did not abuse its discretion in allowing Dr. Berg to offer the abstract opinion that the personality disorders defendant suffered from, i.e., "obsessive compulsive and schizoid and paranoid," would not "in any way prevent a person from committing deliberate and premeditated murder." As the court recognized, Dr. Berg's opinion was merely "descriptive of the condition that [the expert] diagnosed." Dr. Berg's comments did not go to defendant's mental state at the time of the events but, rather, gave jurors an abstract description of defendant's diagnosed condition that they could consider when deciding the ultimate issue of whether he premeditated and deliberated the murders. Unlike Dr. Walser, Dr. Berg was never asked to opine on defendant's mental state at the time of the murders. The court did not abuse its discretion by permitting the testimony.

Finally, defendant contends that the court erred by precluding defense counsel from asking Dr. Walser leading questions such as "whether a person who misperceives reality on a regular basis [is psychotic]." Although the court suggested it would begin to sustain the prosecutor's objections on this ground, it permitted defendant's counsel to elicit Dr. Walser's explanation of the term "psychotic." In addition, elsewhere during Dr. Walser's direct examination, counsel was permitted to ask leading questions. Defendant fails to show any bias in the court's actions with respect to leading questions.

### 5. *Cross-examination of a prosecution rebuttal witness*

Defendant contends that the trial court violated his rights to confront witnesses in precluding the defense from cross-examining Dr. Berg regarding

71

Medi-Cal fraud charges brought against him sometime in the early 1980's. Defense counsel purportedly had a copy of the complaint in the fraud case, a record of the subsequent legal adjudication of Dr. Berg's actual innocence by "a court in Alameda County," an affidavit of an investigator in the case, and "the name of the victim." Counsel, however, did not identify the case number or provide other specifics about the matter, including the year the charges were purportedly filed and the time period during which the conduct assertedly occurred. Nonetheless, we presume, as the parties do, that the Medi-Cal allegations and charges at issue here are the same as those involved in a nearly identical claim raised in *People v. Sapp* (2003) 31 Cal.4th 240, which we rejected on the merits. Our opinion in *Sapp* indicates that the allegations involved conduct between 1982 and 1987. (See *id*. at p. 289.) Dr. Berg was found actually innocent of the charges before defendant's trial. (See *id*. at p. 293, fn. 3.)

For the reasons discussed below, the claim is without merit.

### a. Factual and procedural background

After cross-examining prosecution rebuttal witness Dr. Berg regarding his evaluation of defendant, defense counsel asked the witness whether he had "been a thief" in his "time." The prosecutor objected to the question as argumentative, and the trial court sustained the objection. Counsel then followed up with a question insinuating that Dr. Berg stole "in the neighborhood of $10,000" in a Medi-Cal fraud case during the "early 1980's." The prosecutor again objected and the court held a hearing on the matter outside the presence of the jury.

The prosecutor complained that defense counsel's line of inquiry was improper and unethical, asserting counsel knew Dr. Berg had been found factually innocent of the charges. Counsel conceded he was aware of the factual innocence finding, but argued the finding "means nothing about the reality of fraud."

72

Counsel argued that, although the charges were dismissed after Dr. Berg prevailed on a suppression motion, the sequence of events leading to his exoneration "goes to his bias and goes to his desire to do what he can to keep in[] the system, to keep his viability as a product for the District Attorney's Office and for the criminal defense bar." Counsel stated also that he had "obtained a number of [actual innocence findings] in the course of his career" and "happen[ed] to know how easy it can be to get a declaration of factual innocence." Counsel thus wanted to question Dr. Berg about the circumstances under which he obtained the actual innocence finding and whether the prosecuting agency opposed his efforts in this regard.

Further, defense counsel asserted that Dr. Berg invoked his Fifth Amendment right against self-incrimination in an unrelated criminal case in response to a question by the defendant's attorney, a public defender, as to whether he was innocent of the charges. Also, in response to a news reporter's question about that case, Dr. Berg was quoted as saying, "I was never convicted of any crime in this State or any other state and a story like this would be very harmful to my reputation. This is going to be ruinous to me and I feel ripped off." Counsel urged that these events were relevant to prove Dr. Berg was biased against all public defenders when he testified for the prosecution in defendant's trial, and therefore, was biased against defendant's counsel, also a public defender. Counsel said he had a copy of the newspaper in which the article appeared. The trial court sustained the prosecutor's objection, finding that, under Evidence Code section 352, the proposed cross-examination involved a collateral matter and would necessitate an undue consumption of time.

The court thereafter instructed the jury as follows: "Ladies and gentlemen, with regard to the last two questions that were posed by [defense counsel,] Mr. Veale, I will tell you they were inappropriate questions. There was no factual

73

basis for those questions. And I would ask you to erase that from your mind as not having been said at all."

### b. Discussion

In *Sapp*, the prosecution called Dr. Berg in the penalty phase to rebut defense evidence that the defendant suffered from brain abnormalities and organic dysfunction at the time of the offenses. (*People v. Sapp*, *supra*, 31 Cal. 4th at pp. 287-289.) The defendant there sought to impeach Dr. Berg's credibility by cross-examining him regarding charges of Medi-Cal fraud brought against him four years earlier and subsequently dismissed. (*Id*. at p. 289.) The trial court disallowed the cross-examination under section 352, concluding it involved a collateral matter that was more prejudicial than probative and would "consume too much time" and " 'divert[] the jury, from its primary purpose of deciding the appropriate penalty." (At p. 289.) In rejecting the defendant's claim that the court erred by disallowing the proposed cross-examination, we explained that trial courts have broad discretion " 'to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues . . . . [¶] . . . [I]mpeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' " (*Ibid.*, quoting *People v. Wheeler*, *supra*, 4 Cal.4th at pp. 296-297.)

We also concluded the defendant's argument under the Sixth Amendment lacked merit: "The federal Constitution's confrontation right is not absolute; it leaves room for trial courts to impose reasonable limits on a defense counsel's cross-examination of a witness. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673,

74

679; *People v. Box* (2000) 23 Cal.4th 1153, 1203.) We discern no violation of defendant's right to confront and cross-examine Dr. Berg in the trial court's ruling here. Whether Dr. Berg had or had not filed false claims with Medi Cal was, at most, nominally relevant to the subject matter of his testimony: expert opinion that defendant's criminal behavior was attributable to antisocial personality disorder, not brain abnormalities or family dysfunction." (*People v. Sapp*, *supra*, 31 Cal.4th at p. 290.)

Defendant claims the court violated his Sixth Amendment right to confront and cross-examine witnesses. He seeks to distinguish *Sapp* in that, here, even if Dr. Berg was not guilty of the fraud charges, impeachment on the subject was admissible to show that he was biased in favor of the prosecution and against public defenders whose clients opposed him. Specifically, Dr. Berg's "remarkable success in obtaining suppression of the fraud evidence, dismissal of fraud charges, and a finding of factual innocence" constituted impeachable bias. The sequence of events leading to the actual innocence finding purportedly "could well be linked— in [Dr. Berg's] own mind if not in the minds of the prosecuting agency and the courts that provided the relief he sought—to his service as a witness for the prosecution." Also, defendant asserts his counsel should have had the opportunity to uncover any bias the expert harbored against public defenders as a result of the negative publicity surrounding the criminal case in which he invoked his Fifth Amendment right against self-incrimination, discussed above.

"As a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias. (*People v. Duran* (1976) 16 Cal.3d 282, 294; Evid. Code, § 780, subd. (f) ['the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including . . . [¶] . . . [¶]

75

(f) The existence or nonexistence of a bias, interest, or other motive'].) "[A defendant's] . . . right to cross-examination is not a matter of 'absolute right.' Although we have said that '[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' (*Curry v. Superior Court* (1970) 2 Cal.3d 707, 715, such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' (*People v. Box* [, *supra*,] 23 Cal.4th [at p.] 1203; see *Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 679)." (*People v. Brown* (2003) 31 Cal.4th 518, 544-545 (*Brown*).)

"Moreover, reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*Brown*, *supra*, 31 Cal.4th at p. 545.) "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 680, quoting *Davis v. Alaska* (1974) 415 U.S. 308, 318.) " '[U]nless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility" ([*Delaware v.*] *Van Arsdall*, *supra*, 475 U.S. at p. 680), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' (*People v. Frye* (1998) 18 Cal.4th 894, 946.)" (*Brown*, *supra*, 31 Cal.4th at pp. 545-546.)

We find no abuse of discretion here. No evidence was presented or proffered that Dr. Berg attributed the granting of his suppression motion, dismissal of the fraud charges, and subsequent declaration of his actual innocence to special

76

treatment accorded him because of his prior service as an expert witness for the prosecution, rather than to a just outcome of the judicial process. In addition, defense counsel offered no proof in support of his suggestion that the favorable resolution of the fraud charges was payback for Dr. Berg's service as a witness for the prosecution.

For similar reasons, the court did not err in preventing counsel also from questioning Dr. Berg about the fraud charges for the purpose of showing his asserted bias against public defenders. There was no showing that Dr. Berg had expressed any hostility towards the public defender in the case discussed above, or public defenders in general, or otherwise indicated he held any public defender responsible for the negative publicity about that case. In addition, counsel conceded he did not know whether the news article was accurate. Absent such facts, counsel's proffer that Dr. Berg was biased against all public defenders was speculative. Further, "[t]he jury may not draw any inference from a witness's invocation of a privilege. (Evid. Code, § 913, subd. (a); *People v. Mincey* (1992) 2 Cal.4th 408, 441.)" (*People v. Doolin* (2009) 45 Cal.4th 390, 441-442.)

### 6. *Evidence of complaints about RHA management*

Defendant contends that the trial court erred in excluding evidence of various complaints about RHA managers, most of which purportedly were circulating before defendant was hired by the agency. The excluded evidence included, for example, testimony that there was "some talk" about how Burton obtained her position; that Donald Richmond, a "close friend" of defendant's and former director of personnel administration for the City of Richmond, had received a report from the Inspector General working with the United States Department of Housing and Urban Development (HUD) that indicated Talley and a coworker "did not possess the skills, knowledge, ability to be in their jobs"; that

77

employees complained to Toni Lawrence, a supervisor at RHA, that Talley, who supervised Burton, allowed Burton to do "virtually little or no work" because they were friends; that Connie Taylor, a housing specialist at RHA, had heard from coworkers prior to 1995 that Talley showed favoritism towards certain employees, including Burton; that Hatchett was aware that employees felt they had been mistreated by Talley, Burton, and others and "d[id] nothing to stop it"; and that a RHA employee began to cry when Patricia Jones spoke harshly to her.

Defense counsel offered the evidence as proof of defendant's state of mind when he shot the victims. "I think the poisonous atmosphere bears upon the state of mind of the defendant. He has certainly an emotional and intellectual psychological deficit that is exacerbated by being treated poorly, which he was, and it gives him all kinds of reasons to think there is in fact a conspiracy, that people are wanting to do[], things like that." The court ruled that the evidence was inadmissible hearsay and lacked relevance, and that its probative value was "far outweighed" by its "possible inappropriate prejudicial effect."

Defendant contends the evidence was critical to his mental state defense and although he did not offer the evidence in the penalty phase, now asserts the evidence was also admissible on the question of punishment to show that he believed his actions were morally justified. (See § 190.3, factor (f) [in determining penalty, the trier of fact may consider "[w]hether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct."].)

" 'It is within a trial court's discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. (Evid. Code, § 352.) Our review on this issue is deferential. A trial court's decision whether to exclude evidence

pursuant to Evidence Code section 352 is reviewed for abuse of discretion.' " (*People v. Thomas* (2011) 51 Cal.4th 449, 488.)

Defendant's contention fails. Many, if not all, of the conversations and complaints to which the excluded evidence related occurred before defendant was hired at RHA. Defense counsel made no showing that defendant was aware of these matters. Indeed, defendant here concedes that counsel intended "to illuminate what he *was likely to have* heard and believed about the Housing Authority employees with whom he had hostile interactions." Absent proof of this preliminary fact, counsel could not show the evidence was relevant as bearing on defendant's state of mind or his belief that the killings were morally justified. The record indicates that the court found counsel's showing to be insufficient in this respect. (See *People v. Tafoya* (2007) 42 Cal.4th 147, 165 ["When . . . the relevance of proffered evidence depends upon the existence of a foundational fact, the proffered evidence is inadmissible unless the trial court determines it 'is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence.' "]; Evid. Code, § 403, subd. (a)(1).) And counsel made no showing that the evidence was relevant on any other basis. Accordingly, there was no abuse of discretion.

### 7. *Exclusion of portion of videotaped confession to police*

Defendant contends that the trial court erred by refusing to admit a videotape of his confession to police made within hours of the murders. Defense counsel offered the evidence to impeach the prosecution's expert psychologist, Dr. Berg, whose testimony, in turn, was offered to rebut the evidence that defendant was delusional and suffering from a brief psychotic break when he shot the victims. For the reasons stated below, the claim fails on the merits.

79

### a. Factual and procedural background

On direct examination, Dr. Berg testified that within two days of the murders he interviewed defendant in jail and later, within a few weeks of the commencement of trial, reviewed the various reports by Drs. Walser, Wilkinson, and Kincaid regarding defendant's psychological and neuropsychological tests and MRI results. Dr. Berg opined that, at the time of the murders, defendant acted out of anger, retribution, and revenge, and was neither delusional nor psychotic. During cross-examination, Dr. Berg testified that he had not reviewed the two-and-one-half-hour videotape of defendant's confession to police in forming his opinion, but instead had reviewed an interrogating officer's written summary of the confession and the circumstances under which it was made. Thereafter, defense counsel sought to admit and play for the jury the videotaped confession in order to test Dr. Berg's credibility. Counsel acknowledged defendant's videotaped statements were inadmissible for their truth under the hearsay rule, and instead offered the evidence under the state of mind exception as circumstantial proof that when defendant gave his confession, he continued to exhibit the disorganized thinking that Dr. Walser opined he experienced when he shot the victims. (Evid. Code, § 1250.) [6] Counsel did not identify specific portions of the videotape that he wanted to admit.

The prosecutor objected on the grounds that the evidence was irrelevant and unreliable hearsay and that he would be denied an opportunity to cross-examine defendant. The court denied counsel's request to play the entire videotape on the

---

[6] As relevant, Evidence Code section 1250, subdivision (a) permits "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

ground that the consumption of time involved in doing so would outweigh the probative value of the evidence.  (Evid. Code, § 352.)  It permitted counsel to play only specific excerpts from the videotape to buttress the defense evidence that defendant was delusional at the time of the murders.  When counsel resumed cross-examination, counsel played for the expert and jury a seven-minute excerpt of the videotape in which defendant discussed the murders and talked about Talley laughing at him on the day of the murders.  Counsel asked Dr. Berg whether defendant's statements were evidence that defendant hallucinated hearing Talley's laughter, and the expert answered they were "less than weak" evidence that defendant was hallucinating.

During redirect examination, the prosecutor played an excerpt that purportedly showed defendant was engaged in a rational, matter-of-fact discussion of the murders with investigators and suggested he shot the victims because they had "screwed with him."  On recross-examination, defense counsel again sought to admit and play the entire videotaped confession or, in the alternative, additional excerpts that purportedly evidenced defendant's disorganized thinking and remorse during the interview.  For example, in one excerpt defendant asked investigators, "Where is Lorraine?" and "Where is Barbara?" and said "I am sorry about that," evidently referring to the shootings.  In another, defendant stated, "I mean, I really say that I'm truly I am sorry that I done this now. . . . You know, the family is tore up just like my family is tore up."  Counsel sought admission of the evidence of defendant's remorse to rebut Dr. Berg's implication, on cross-examination, that defendant assassinated the victims, asserting the evidence was unlike what one would reasonably expect the typical coldhearted and detached assassin would feel after committing a murder.  The prosecutor conceded the additional evidence of defendant's delusional state was admissible state of mind evidence but objected that defendant's statements expressing remorse and

81

acknowledging the harm he had caused the victims' families were hearsay and an impermissible appeal to the sympathies of the jury. The court admitted, and permitted defense counsel to play, the videotape excerpts offered as circumstantial proof of defendant's disorganized thinking (i.e., his asking where Lorraine and Barbara were) and excluded the remainder of the proffer on hearsay grounds.

### b. Discussion

We first address defendant's contention that the court erred in denying his counsel's request to play for the jury the entire videotaped confession to police in order to contradict Dr. Berg's opinion that defendant was not psychotic when he shot the victims. " 'The courts have traditionally given both parties wide latitude in the cross-examination of experts in order to test their credibility. [Citations.] Thus, a broader range of evidence may be properly used on cross-examination to test and diminish the weight to be given the expert opinion than is admissible on direct examination to fortify the opinion. [Citation.]' " (*People v. Montiel* (1993) 5 Cal.4th 877, 923-924.) "It is common practice to challenge an expert by inquiring in good faith about relevant information, including hearsay, which he may have overlooked or ignored." (*Id.* at p. 924; *People v. Gonzales* (2011) 51 Cal.4th 894, 923-924.)

Here, the videotaped confession consisted of statements of a declarant made out of court and therefore was admissible only if it was offered for a nonhearsay purpose or fell within an exception to the hearsay rule. The trial court properly permitted counsel to play the above identified excerpts under the state of mind hearsay exception and to inquire whether the prosecution's expert considered the evidence in forming his opinion. Although the court offered to consider any additional excerpts that counsel identified as potentially relevant to test the expert's opinion, counsel did not avail himself of this opportunity. Consequently,

defendant cannot now complain that the court erroneously excluded any remaining portion of the videotape that was relevant to test the expert's opinion. In addition, because counsel offered the video excerpts of defendant's expressions of remorse solely for their truth, that is, to establish he was sorry for his crimes, the court did not err by excluding them under the hearsay rule.

Finally, defendant asserts for the first time on appeal that the excerpts depicting his expressions of remorse were also admissible pursuant to the rule of completeness under Evidence Code section 356.[7] "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*People v. Arias*, *supra*, 13 Cal.4th at p. 156; *People v. Samuels* (2005) 36 Cal.4th 96, 130.) The excerpts were admissible, he contends, in order to avoid leaving jurors with the misleading impression created by the excerpt introduced by the prosecutor, in which defendant appeared to be rational while conversing with the detectives and suggested he killed the victims because they had "screwed with him." Defense counsel intended to accomplish this by showing the outpouring of grief that assertedly followed defendant's "screwed with them" statement. Defendant, however, did not object on this ground at trial, and thus forfeited the claim on appeal. (See e.g., *People v. Partida* (2005) 37 Cal.4th 428, 435-438.) In any event, defendant fails to demonstrate that the excerpt introduced by the prosecutor was misleading, much less that defendant's expressions of remorse

---

[7] Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

during the police interview were relevant to his state of mind at the time of the murders.

### 8. *Admission of the autopsy reports and Dr. Peterson's testimony*

Aaron Lipton, a pathologist then employed by Contra Costa County, performed the autopsies on Lorraine Talley and Barbara Garcia. At the time of defendant's trial, Dr. Lipton was no longer employed by the county. The prosecutor represented that he did not know where he could be found and that a forensic pathologist, Brian Peterson, now routinely performed the autopsies for the county.[8] At the prosecutor's request, Dr. Peterson reviewed the contents of the certified copies of Dr. Lipton's autopsy reports and the photographs taken of their bodies during the autopsies. Relying on these reports and photographs, Dr. Peterson described in detail the conditions of Talley's and Garcia's bodies and also conveyed Dr. Lipton's opinions as to the cause of death of each victim: Talley's death was caused by "brain destruction due to a gunshot wound to the head with a contributory cause[] of gunshot wound to the abdomen," and the cause of Garcia's death was a gunshot wound to the head with a contributory cause of two gunshot wounds to the abdomen. Dr. Peterson testified that he agreed with these opinions.

Defendant contends that the autopsy reports and Dr. Peterson's testimony constituted testimonial hearsay, and that under *Crawford v. Washington* (2004) 541 U.S. 36, 59 (*Crawford*), admission of the evidence violated his Sixth Amendment right to confront and cross-examine Dr. Lipton.[9]

---

[8] Defendant did not dispute that Dr. Lipton was not available to testify at trial.

[9] Defendant does not contend the autopsy photographs were erroneously admitted.

84

*a. Forfeiture*

The People contend that defendant forfeited his claim because defense counsel objected only on hearsay grounds to Dr. Peterson's testimony and failed to object on any basis to admission of the autopsy reports. We disagree.

This case was tried before *Crawford* overruled *Ohio v. Roberts* (1980) 448 U.S. 56, which for 24 years governed the admissibility of statements from witnesses unavailable at trial. *Roberts* held that admission of an unavailable witness's statement does not violate the Sixth Amendment's confrontation requirement "so long as [the statement] has adequate indicia of reliability — *i.e.*, falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.' " (*Crawford*, *supra*, 541 U.S. at p. 42.) In *People v. Clark*, *supra*, 3 Cal.4th at page 159, a case decided before defendant was tried, this court held that admission of the contents of an autopsy report prepared by a nontestifying pathologist did not violate the defendant's confrontation rights where the contents of the report "were admitted under a 'firmly rooted' exception to the hearsay rule that carries sufficient indicia of reliability to satisfy the requirements of the confrontation clause." (See also *People v. Beeler* (1995) 9 Cal.4th 953, 979-980 [same].) As shown below, "*Crawford* dramatically departed from prior confrontation clause case law." (*People v. Giles* (2007) 40 Cal.4th 833, 840.) Thus, we find it represents an unforeseen change in the law "that competent and knowledgeable counsel reasonably could [not] have been expected to have anticipated" at defendant's 1996 trial, and excuse his failure to object. (*People v. Black* (2007) 41 Cal.4th 799, 812; see also *People v. Williams* (1976) 16 Cal.3d 663, 667, fn. 4 [recognizing an exception to the objection requirement where counsel cannot be faulted for failing to anticipate change in the law].)

### b.  Discussion

In *Crawford*, the United States Supreme Court held that admission of testimonial out-of-court statements offered against a defendant violates the Sixth Amendment confrontation clause unless the witness is unavailable at trial and the defendant had a prior opportunity for cross-examination.  (*Crawford*, *supra*, 541 U.S. 36.)  "*Crawford* did not define the term 'testimonial,' but it mentioned several *possible* definitions, by several sources, of statements that are testimonial in nature, including ' "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," [citation]; [and] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . " [citation].'  (*Id*. at pp. 51–52.)" (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 657.)  The high court has since held examples of testimonial evidence include certificates of laboratory analyses created to prove a fact in a criminal proceeding.  (See, e.g., *Bullcoming v. New Mexico* (2011) __ U.S. __ [131 S.Ct. 2705, 2709] [laboratory report certified by nontestifying analyst stating the defendant's blood-alcohol level was above the legal limit]; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 308 [certificates of analysis prepared by nontestifying analysts stating that the substance seized from the defendant was cocaine].)  In contrast, testimonial evidence does not include a laboratory report that was produced for the primary purpose of catching a rapist who was still at large and not to obtain evidence for use against the defendant, who not under suspicion at that time.  (*Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221, 2243-2244] (plur. opn. of Alito, J.)

Recently, in *People v. Dungo* (2012) 55 Cal.4th 608, we held that statements in an autopsy report describing a nontestifying pathologist's observations of the condition of the victim's body were not testimonial.

"[S]tatements, which merely record objective facts, are less formal than statements setting forth a pathologist's expert conclusions. They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment." (*Id*. at p. 619.) In addition, the primary purpose of recording the facts in question did not pertain to a criminal investigation. (*Id*. at pp. 619-620.)

This case is distinguished from *Dungo* because the *Crawford* issues involve the admission at trial of entire autopsy reports prepared by a nontestifying pathologist (Dr. Lipton) and the testimony of another pathologist (Dr. Peterson) who described the objective facts and opinions expressed in the reports. However, we need not decide whether, following our decision in *Dungo*, the evidence here is testimonial because any error in the admission of the autopsy reports and Dr. Peterson's testimony was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; see *People v. Rutterschmidt*, *supra*, 55 Cal.4th at p. 661 [any erroneous admission of the lab reports indicating the presence of alcohol and three sedating drugs in the victim's blood samples was harmless].)

"The beyond-a-reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' ([*Ibid*.]) 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' (*Yates v. Evatt* (1991) 500 U.S. 391, 403.) Thus, the focus is on what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the . . . verdict actually rendered in this trial was surely unattributable to the error.' (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)" (*People v. Neal* (2003) 31 Cal.4th 63, 86.)

87

The cause of death of each victim was undisputed. Defendant admitted he fired multiple bullets into Talley and Garcia. Each victim died at the scene. Defense counsel conceded to the jury that defendant intended to kill Talley and Garcia and that the sole contested issue was whether defendant killed them with premeditation and deliberation. The prosecution's evidence, apart from the autopsy evidence, overwhelmingly established these elements. (See discussion, *ante*, pt. II.B.1.f.)

The jury also viewed numerous photographs depicting, among other things, the gunshot wounds that defendant inflicted on each victim, the positions and condition of the victims, and a spent bullet under Garcia's head. The photographs were authenticated by Kime, Spears, and Jones, who were in the rooms where defendant shot the victims, as well as law enforcement personnel who responded to the crime scene.

In sum, in light of the above evidence, the significance of the contents of the autopsy reports and Dr. Peterson's testimony on the question of premeditation and deliberation was slight. As a result, any error in the admission of this evidence was harmless beyond a reasonable doubt.

**C. Penalty Phase Issues**

*1. Victim impact evidence*

Defendant contends the court erred in admitting the victim impact testimony, in violation of his rights under the Eighth Amendment. We disagree.

Over defendant's objection, the prosecution presented victim impact evidence through the testimony of numerous family members and friends of the victims and several eyewitnesses to the crimes.

Gladys Dean, Lorraine Talley's mother, described Lorraine, her only child, as "bubbly" and "jolly." Mrs. Dean said that when she learned of Lorraine's death, "something just left me . . . . I was empty."

Lorraine's 23-year-old daughter, Tenisha Talley, described how her world "has been turned upside down, inside out" since her mother was murdered. Tenisha described how her grandmother had become "more of a cold person" after Lorraine's death. "[S]he wakes up every day and knows she doesn't have a daughter to talk to. She can't go over and see Lorraine. She can't hear Lorraine's voice anymore."

Lorraine's 22-year-old daughter, Nakia Talley, said it was "was like a movie" when she learned of her mother's death. She was with her grandmother at the time, whom she described as "look[ing] just dead" and "hollow." When Nakia tried to console her grandmother, "she just looked up at me and her eyes were all glassy and she was just crying and shaking and I couldn't stop that. I couldn't make it go away. I could not make her not hurt."

Harriette Langston was a lifelong friend of Lorraine's. "[Lorraine] was like a sister to me. She was so much a part of my life and I miss her very much." Langston was on the telephone with Lorraine moments before defendant shot her. When Lorraine told her that she had to fire defendant that day, Langston suggested that she call the police. Lorraine responded, "Harriette, I don't want to embarrass him. That would just be awful for him to be carted out of here by the police." When Langston was informed that Lorraine had been fatally shot, she became "numb."

Sam Burns, a deputy sheriff with the Contra Costa County Sheriff's Department, was once married to Lorraine; they had a child together. When Burns told their son that his mother was dead, he started crying and asked if it "was the

89

man at work." Within a week after the murders, Burns was on duty at the county jail and was upset to see defendant in the courtyard "laughing and smiling."

Maurice Mims had known Lorraine for 13 years and had been romantically involved with her for the five years preceding her death. Since Lorraine's death, Mims's life had been "totally hell" and "miserable."

Pamela Kime, who was in the conference room when defendant shot Lorraine, had to leave her job at RHA in July 1995. She was no longer able to go to places with noisy crowds, including stores and concerts, because they scared her. Kime described how there were times when she was afraid to leave her house and for a month had to arrange for somebody to take her daughter to school. She testified that when she went to bed, she could still see the shootings and hear gunshots.

Shirail Burton and Lorraine were very close friends. Lorraine was her labor coach and saw both of her children born. Since Lorraine's murder, Burton had been "walking around with a broken heart that you know [is] never going to get mended . . . ." There had not been "a minute of the day" that she had not thought of Lorraine.

Patricia Jones described emerging from under her desk after the shooting and recalled seeing Barbara Garcia "lying there gurgling." Despite her fear that defendant might still be in the building, she ran down the hall to get help. Jones saw people "hysterically standing around screaming," Kime with blood all over her hands, and Talley's body. Jones said she "broke down" just prior to attending the memorial service for Barbara after thinking about the "horror of the whole episode, the thought of being crouched there under the desk, not knowing what was going to happen . . . ."

Janet Robinson described Barbara as someone who was "funny" and "full of life," and who had a lot of hopes and dreams for the future. In the 17 months

90

between the murders and the time of trial, Robinson's "[whole] life completely stopped." She lived like a recluse for about a year after the murders and left her home only to go to appointments with her psychologist and chiropractor. Robinson lived with "a lot of fear" and feared for her children and husband because she believed "if this could happen once, it could happen again."

Robinson was terminated from her job at the RHA, which she attributed to her experience of having witnessed the murders. She twice tried to go back to work but found it impossible to return to the place where her friends had been killed. Robinson felt guilty because her friends died and wished she could have done more to protect Lorraine and Barbara.

Irma Abarca, Barbara's aunt, had known Barbara since she was a child and described Barbara as "a happy person, real loving." She described how Barbara's father, Guillermo Garcia, became angry when he learned that Barbara was dead and the police would not let him see Barbara at the crime scene.

Abarca's 15-year-old daughter, Celia, testified Barbara was like a sister to her and described the emotional impact of Barbara's death.

Genoveva Calloway, Barbara's aunt, drove Barbara's father to the crime scene, where he became very upset because police would not allow him to see Barbara's body. Calloway described how Barbara's parents were very emotional during the memorial service and cremation of Barbara's body. Barbara's parents "still have the ashes in the house in the living room. They talk with her. And they're still in a lot of pain." For several months after Barbara's death, her parents could not go back to work. Mrs. Calloway described seeing Guillermo hold the urn with Barbara's ashes and cry, "[A]ll he can do is just cry and cry and just talk with her . . . . [H]e cannot let go of her."

Defendant contends the quantity of victim impact evidence introduced exceeded that permitted under *Payne v. Tennessee* (1991) 501 U.S. 808, 825

91

(*Payne*).  He also complains that the admission of testimony about the effect of the victims' deaths on the community and from nonrelatives "went far beyond" that authorized by *Payne*.

"The Eighth Amendment does not prohibit the admission of evidence showing how a defendant's crimes directly impacted the victim's family, friends, and the community as a whole, unless such evidence is 'so unduly prejudicial' that it results in a trial that is 'fundamentally unfair.'  (*Payne*[, *supra,*] 501 U.S. [at p. 825 . . .); see *People v. Marks* (2003) 31 Cal.4th 197, 235-236.)  Likewise, under state law, victim impact evidence is admissible as a circumstance of the crime under section 190.3, factor (a), so long as it 'is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case.'  (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180; see *People v. Zamudio* (2008) 43 Cal.4th 327.)"  (*People v. Taylor*, *supra*, 48 Cal.4th at pp. 645-646.)

The victim impact evidence fell within permissible parameters.  (*People v. Pollock*, *supra*, 32 Cal.4th at p. 1180.)  The overall number of victim impact witnesses was not excessive, given that there were two murder victims, and the testimony included three generations of the victims' families.  (See *People v. Taylor*, *supra*, 48 Cal.4th at p. 646 [finding no error in the admission of the victim impact testimony of six family members representing four generations of the victim's close family].)  The evidence was "very typical of the victim impact evidence we routinely permit."  (*People v. Valencia* (2008) 43 Cal.4th 268, 300.)

Defendant additionally challenges as improper evidence that Talley showed compassion toward defendant when she decided to spare him the embarrassment of having police escort him from RHA upon his termination.  But evidence that described Talley's uniqueness, e.g., her compassion towards others including, ironically, defendant, is of the type specifically permitted under *Payne*.  (*Payne*,

92

*supra*, 501 U.S. at p. 823 [victim impact evidence "is designed to show . . . *each* victim's 'uniqueness as an individual human being' "].)

To the extent defendant argues that victim impact evidence from a close friend or companion is inadmissible, we have rejected this argument. (*People v. Ervine* (2009) 47 Cal.4th 745, 792.)

Finally, defendant insists that Deputy Burns's testimony that he observed defendant laughing and smiling in the jail courtyard shortly after the murders was an improper subtle plea for a death sentence and was also prejudicially "massive[] and emotional[]" because the prosecutor referred to it in arguing that the jury should return a death verdict in order to deprive defendant of the opportunity to enjoy himself while in custody. We disagree. Burns's testimony was not unduly emotional, and the jury reasonably understood Burns was expressing anger about having observed defendant enjoying himself in custody within days after killing the victims. Further, it was not improper for the prosecutor to refer to Burns's testimony to argue death was the appropriate punishment on the basis that defendant should be "deprive[d] . . . of what he deprived his victims of" — all the pleasures of life.

### 2. *Photographs of the victims*

Defendant contends that the trial deprived him of a fair trial by permitting the prosecutor to keep "the frames of the photographs" of the victims face down on a chair that were pushed under the counsel table during presentation of defendant's penalty phase case-in-chief and closing argument. Assertedly, the photographs generated juror sympathy and, because only the frames were revealed, "h[e]ld the power to distract." The claim fails on the merits.

Before presentation of the defense evidence, photographs of the victims that the prosecutor had used during presentation of the People's case-in-chief were

93

placed face down on chairs that had been pushed under the counsel table. Subsequently, defense counsel testified on defendant's behalf. After counsel concluded presentation of the defense case, he informed the court that: "As I was up on the witness stand, it became apparent to me that even though photographs may have been on the chairs, they were visible to the jury and have been—at least to some members of the jury, from my perspective, and so I'd like to make a record of that fact." The court observed that the photographs were on the chair "pushed underneath the counsel table" and that, from its perspective, it could not see them. At defense counsel's request, the trial judge sat in various juror seats and stated he could see from "side glances" the bottom or a portion of the bottom of the chairs on which the photographs had been placed.

The court thereafter denied defense counsel's motion to remove the photographs from the courtroom, ruling the prosecutor could use demonstrative evidence during argument. Subsequently, the prosecutor displayed the photographs during his closing argument. After the prosecutor concluded his argument, defense counsel renewed his request to remove the photographs from the courtroom on the ground that they were constant reminders of the victims. The court denied the request, but asked the prosecutor to turn the photographs over during the defense argument. The record shows that, during the defense closing argument, the photographs were again placed face down on a chair under the counsel table.

To the extent defendant contends the court erred in permitting the prosecutor to display photographs of the victims during his closing argument, the claim fails on the merits. (See, e.g., *People v. Carpenter* (1997) 15 Cal.4th 312, 401 [photographs of the victims of the charged offenses are generally admissible"]; *People v. Cox* (1991) 53 Cal.3d 618, 688 [photographs of the victim

94

while alive "visually depicted a 'circumstance of the crimes,' portraying the victims as defendant saw them seconds before he killed them"].)

To the extent defendant contends that during presentation of the defense evidence and the defense closing argument, the court improperly permitted the prosecutor to keep the photographs face down on the chair underneath the counsel table with the frames visible, he fails to demonstrate an abuse of discretion. At most, the frames, not the photographs, could be viewed from several juror seats. Even assuming the jurors did see the frames under the counsel table, defendant does not demonstrate how this might have affected their penalty decision. Nor does defendant establish that counsel was distracted in presenting the defense case.

### 3. The 33 letters

Defendant contends that the trial court erroneously excluded the contents of 33 character reference letters offered during direction examination of defendant's mother, Mary Jane Thomas. Mary Jane testified that she had solicited the letters on defendant's behalf. Defense counsel offered the letters "as probative of something that has to do with this case and the issues before the jury" or "simply for their existence, not as hearsay."

Upon reviewing the letters, which the court described as generally "character reference type letters, or testimonials of [defendant]," it excluded them as cumulative of evidence that had been introduced either in the guilt or penalty phase. (Evid. Code, § 352.) Also, the authors of several of the letters had already testified about "their feelings [] as to [defendant] as an individual and his worth as a person." In addition, the court found that counsel failed to lay an adequate foundation for admission of the letters under an exception to the hearsay rule or in an alternate form of proof, noting that all of the letters were authored by people who apparently resided in the Bay Area and could have been summoned to testify.

95

Finally, with respect to all but three of the letters, the court found their contents lacked trustworthiness because defendant's mother had solicited them during the pendency of a trial in which defendant's "character [would be] called into question in the actual heat of litigation."

Defendant maintains that exclusion of the evidence violated his federal due process right to have the jury consider in mitigation any aspect of his character that would allow it to return a life sentence. Citing *Green v. Georgia* (1979) 442 U.S. 95, 97, defendant maintains that even assuming the evidence was excludable under our state rules of evidence, it should have been admitted because the evidence was relevant to an issue in the penalty phase of a capital trial. The claim lacks merit.

"In *Green*, although the [hearsay] statement was not otherwise admissible, the Supreme Court permitted the admission of a declaration against penal interest that the declarant shot the victim after ordering Green to leave because it was 'highly relevant to a critical issue in the punishment phase of the trial' and 'substantial reasons existed to assume its reliability.' ([*Green v. Georgia*, *supra*, 442 U.S.] at p. 97, 99.)" (*People v. Eubanks* (2011) 53 Cal.4th 110, 150.) Although we recognize a defendant's right under our state rules to introduce reliable mitigating evidence at the penalty trial, we have repeatedly declined to give *Green* the broad reading that defendant urges. (See *ibid*.; *People v. Weaver* (2001) 26 Cal.4th 876, 980-981 (*Weaver*).) Here, as in *Eubanks* and *Weaver*, we conclude that with the exception of the three letters that were not solicited by defendant's mother, the proffered evidence " 'bore no special indicia of reliability, so the rule [set forth in *Green v. Georgia*] did not require the trial court to dispense with the hearsay rule.' (*Weaver*, at p. 981.)" (*Eubanks*, at p. 150.)

Defendant argues that the reliability of the contents of the letters is shown by their authenticity, which was undisputed, and their uniqueness, because each

96

appears to represent the writer's own opinion of defendant's character. He asserts that to the extent that some of the contents contradict evidence introduced at trial, such discrepancies reflect the writers' limitations of perspective and personal knowledge. But like the trial court, we cannot ignore the fact the letters had been solicited by defendant's mother during the pendency of his trial, when his character would be at issue, and we therefore cannot conclude under *Green* that they are particularly reliable.[10] (See also *Weaver, supra*, 26 Cal.4th at pp. 980-981.)

With regard to the remaining three letters, which were not solicited in anticipation of trial, the trial court did not err by excluding this evidence notwithstanding *Green*. Each of the letters was an employment reference letter written before defendant committed the murders, and each stated in fairly general terms that he was reliable and hard-working. To the extent that they were relevant, they were, as the trial court held, cumulative of other testimony regarding defendant's character presented during the penalty phase. Thus, they were not the sort of testimony "highly relevant to a critical issue" in the penalty phase such that admission of this evidence was compelled by the federal Constitution. (*Green v. Georgia*, *supra*, 442 U.S. at p. 97.) For the same reasons, their exclusion was harmless under any standard.

---

**10**    Because we conclude the letters lack trustworthiness, defendant's contention that they were admissible under the state of mind exception to the hearsay rule (Evid. Code, § 1250), as evidence that each author was fond of him, necessarily fails. (See *People v. Edwards, supra*, 54 Cal.3d at p. 819, quoting Evid. Code, § 1252 ["Evidence of a statement is inadmissible . . . if the statement was made under circumstances such as to indicate its lack of trustworthiness."].) Additionally, defendant's failure to raise this theory of admissibility at trial forfeited the claim on review. (Evid. Code, § 354.)

Finally, defendant was not precluded from presenting this evidence, only from introducing it in the form of proof offered. As the court suggested, defense counsel could have sought to compel the authors' in-court testimony through the subpoena process.

### 4. Counsel's testimony

During the penalty trial, defense counsel informed the court and the prosecutor outside the presence of the jury that he intended to testify as the last defense witness. Counsel proffered that he would explain the circumstances under which defendant said "I smoked that bitch," during an interview on September 6, 1995, with counsel in which Drs. Kincaid and Wilkinson also were present and would describe defendant's related behavior during a confidential interview with counsel on September 3, 1995. The court overruled the prosecutor's objection to the admission of this testimony, allowing counsel to testify regarding both interviews. The court, however, expressed concern that counsel may have violated a canon of judicial ethics by proffering the evidence near the close of the defense case in the penalty phase and where other witnesses might have been available to testify.

Defense counsel also requested permission to testify and describe that during his initial interviews with defendant, defendant "basically . . . would break down and start crying." Because counsel was alone with defendant when defendant purportedly displayed remorse, he did not know how otherwise to introduce the evidence.

Objecting that defense counsel had failed to provide discovery of the proffered testimony, the prosecutor asked the court to exclude it. (§ 1054 et seq.) In response, counsel explained that he did not take notes of his conversations with defendant and that there was "nothing in writing" he could provide in discovery.

The court noted that defense counsel had not included his name on the defense witness list at any time during trial, and stated it assumed that counsel's decision was made "last minute based upon something that occurred in the course of the trial."  It continued:  "What I believe is appropriate under the circumstances is I will allow you to testify as you initially indicated to [the September 3 and September 6 interviews].  To go beyond that, I believe would call upon you to divulge matters of discovery which you have not divulged and you have not given me any reason why you have not divulged matters in discovery."  The court precluded counsel from testifying about defendant's alleged displays of remorse during his initial interviews with counsel.  When counsel repeated that he had no notes from those interviews and argued there was no discovery to provide, the court responded:  "All right.  I think there are certainly things if you anticipated you were going to be a witness on this matter that you as a witness could have prepared for the other side so that they would know the scope and nature of your testimony regarding these matters, rather than [offer] some sort of free-flowing state of consciousness type of [testimony].  I believe that's only fair.  That's appropriate."

On appeal, defendant contends that the court erred in precluding counsel from testifying about defendant's displays of remorse.  Specifically, he contends that the exclusion of the evidence was an unauthorized sanction under the discovery rules.  (See § 1054 et seq. [reciprocal discovery statutes].)  Here, because any error was harmless, we need not decide whether the trial court erred by limiting counsel's testimony, or under what circumstances it may be permissible for trial counsel to testify as a witness in the case.

State law error occurring during the penalty phase requires reversal if there is a reasonable possibility that the error affected the verdict.  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960-961.)  This standard "is the same, in substance and

99

effect" as the "*reasonable doubt*" test under *Chapman v. California*, *supra*, 386 U.S. 18. (*People v. Jones* (2003) 29 Cal.4th 1229, 1264, fn. 11, italics omitted.)

In this case, defendant planned his massacre for months in advance and boasted to Robinson and Ferguson how he practiced at the shooting range the night before the murders. He hunted down his victims and shot each execution style, and the evidence strongly suggests that as he exited the building, he intended to shoot a third victim. The improperly excluded evidence that defendant appeared to be sobbing and "tore up" during his initial interviews with counsel would not have appreciably strengthened his case in mitigation. Defendant did not offer into evidence the *statements* of remorse he purportedly made during these emotional outbursts, conceding they were inadmissible hearsay. Absent this evidence, however, the jury could only speculate that he was expressing remorse for his crimes instead of concern for his own fate. The omitted evidence, therefore, was no more compelling than the evidence of defendant's other claim of remorse — that while in custody awaiting trial, he talked with the head chef at Contra Costa County jail about the murders and appeared to be sorry. Under these circumstances, there is no reasonable possibility that the jury would have returned a different verdict had the jury been presented with defense counsel's testimony that defendant appeared remorseful.

### 5. *Asserted misstatements of the law*

#### a. *Section 190.3, factor (c), the presence or absence of any prior felony conviction*

During penalty phase closing argument, the prosecutor told the jury that defendant's lack of a violent criminal history and felony convictions was neither mitigating nor aggravating, but neutral. The court sustained defense counsel's objection and instructed the jury that "[w]ith regard to Factor C, the presence or absence of any prior felony conviction other than the crimes for which the

100

defendant has been tried in the present proceedings, the presence of such convictions are an aggravating factor, the absence of such convictions are a mitigating factor in all other matters as has been suggested, the presence may be an aggravating factor, the absence may be a mitigating factor. [¶] Or it may be considered by you to be neutral with regard to B and C, the presence is an aggravating factor, the absence of such factor is a mitigating factor."

Thereafter, the prosecutor argued that the question before the jury in considering the applicability of section 190.3, factor (c) required "[the jury] to decide how much weight to give to any alleged mitigating circumstance. So it's up to you to decide how much you should favor [defendant] because he doesn't have a felony conviction. How special he should be because of that, how many blue ribbons you want to paint on his chest because he doesn't have a felony conviction or he didn't commit a crime of violence."

Defendant contends that the court's corrective action in providing the jury with an explanation of section 190.3, factor (c) was insufficient and that it should have admonished the prosecutor for misstating the law. Also, defendant contends the prosecutor's argument telling the jurors how they should apply factor (c) was improper. The contentions are without merit.

Preliminarily, by failing to request an admonition, defendant forfeited his claim that the court should have admonished the prosecutor. (See *People v. Fuiava*, *supra*, 53 Cal.4th 728.) Defendant also forfeited his claim that the prosecutor's argument misstated the law because he failed to object and ask that the jury be admonished. In any event, the claims are without merit.

"We have concluded in prior decisions that a trial court need not instruct that the absence of prior felony convictions is necessarily mitigating. [Citations.] We reasoned that a jury instructed that it may consider the *absence* of prior felony convictions [citations] and any ' "aspect of the defendant's character or record that

the defendant offers as a basis for a sentence less than death" ' [citation] will necessarily understand that it may consider in mitigation a defendant's lack of prior felony convictions." (*People v. Pollock*, *supra*, 32 Cal.4th at p. 1194.) Nothing in the court's instruction prevented jurors from according whatever mitigating weight they believed appropriate to defendant's lack of prior felony convictions. The trial court did not err.

In addition, the prosecutor's argument did not ask the jury to misapply section 190.3, factor (c) in deciding penalty. His suggestion that the jury not consider defendant special or worthy of "blue ribbons" merely because he did not have any prior convictions did not contravene the law. Instead, the prosecutor properly argued this circumstance was not worthy of mitigating weight. "Since the crux of the jury's decision is the weighing of aggravating and mitigating factors, a prosecutor may properly comment on the absence of mitigating factors so long as the prosecution refrains from suggesting that absence of mitigation is to be equated with aggravation." (*People v. Kaurish* (1990) 52 Cal.3d 648, 706.) The prosecutor did not cross this line.

> ### b. *Section 190.3, factor (h), lack of capacity to conform conduct to requirements of law as a result of mental disease or defect*

Section 190.3 provides that, in deciding penalty, the jury shall consider under factor (h) "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication." Defendant contends that the court erred in refusing counsel's request to instruct the jury that factor (h) was applicable in this case. We disagree.

During argument, the prosecutor incorrectly asserted that "this factor is the definition of insanity"[11] and that Dr. Walser had conceded that defendant was not insane. The court overruled without comment counsel's objection to the prosecutor's misstatements. Thereafter, the prosecutor asserted that section 190.3, factor (h) was "an insanity thing, maybe it's not quite there, but pretty close. You can still consider the evidence, though it doesn't rise to the level of insanity." He contrasted factor (h) with "the mental duress or emotion, the stress" that is "already covered under [section 190.3, factor] (d)" and "if one thing applies to two separate things, you just consider it where it best belongs." The court overruled counsel's objection to this line of argument, stating, "It's argument."

Subsequently, outside the presence of the jury, the court conducted a hearing on the definition of insanity and the application of section 190.3, factor (h). Defense counsel stated, "I think the Court should indicate the objection was properly made and should have been sustained at that time, that the District Attorney, his comments misled this jury into believing that factor (h) had no application in this case when, in fact, it does because there is evidence of impaired mental capacity in this case. That is what I now request the Court to say to the jury." In essence, counsel wanted the court not only to correct itself and properly instruct the jury as to the terms "factor (h)" and "insanity" but also to inform the

---

**11** "CALJIC No. 4.00, the standard instruction on the insanity defense . . . states: 'A person is legally insane when by reason of mental disease or mental defect he was incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from wrong at the time of the commission of the crime.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 830-831; see also *People v. Babbitt* (1988) 45 Cal.3d 660, 721 ["Whereas the insanity instruction requires that a defendant lack 'substantial capacity' to appreciate the criminality of his conduct or to conform his conduct to the law, subdivision (h) requires only that his capacity to do so be 'impaired.'].)

103

jury that "there is evidence of impaired mental capacity in this case," i.e., that factor (h) was applicable.

The court responded that it was "unable to tell a jury that this evidence is aggravating, this evidence is mitigating." It then correctly instructed the jury that "[f]actor (h) includes other states which impair mental capacity" and properly described section 190.3, factor (h) and defined insanity in accordance with the law.

The court's corrective action was adequate to cure any harm from the prosecutor's mischaracterization of section 190.3, factor (h). Defendant had the opportunity to argue the evidence he offered was mitigating under factor (h). The prosecutor was entitled to argue the opposite. Whether his recollection that Dr. Walser testified defendant was not insane was correct was a question for the trier of fact, and the argument was a proper comment on the evidence. Additionally, the prosecutor did not argue that the evidence was aggravating. (*People v. Kaurish*, *supra*, 52 Cal.3d at p. 706.)

### 6. *Alleged instructional error regarding aggravating evidence*

Defendant contends that when the court instructed jurors with CALJIC No. 8.88, it was required to identify on its own motion the elements of first degree murder and admonish jurors that they were not themselves aggravating circumstances. Defendant complains that, absent such an instruction, the jury was permitted to consider impermissible factors in deliberating the penalty question.

Defendant's concern essentially is that the jury based its death verdict on their findings in the guilt phase that he murdered Talley and Garcia with premeditation and deliberation. He contends the jurors misapplied the penalty phase instructions in this manner because the court instructed them during voir dire that premeditation and deliberation could be considered circumstances of the

104

crime under section 190.3, factor (a). Defendant maintains that as a result, in the absence of an express prohibition on their doing so, he was condemned in violation of the rule against labeling as aggravating any circumstance common to all murders or applicable to every defendant eligible for the death penalty.

In support, defendant cites the United States Supreme Court's decision in *Arave v. Creech* (1993) 507 U.S. 463, which states in relevant part: "When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. [Citations.] If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." (*Id*. at p. 474.) Under these circumstances, defendant contends the court was required to provide an instruction that clarified that premeditation and deliberation were elements of the capital crimes in this case, and thus could not be considered in aggravation.

"In deciding whether an instruction is erroneous, we ascertain at the threshold what the relevant law provides. We next determine what meaning the charge conveys in this regard. Here the question is, how would a reasonable juror understand the instruction. (E.g., *California v. Brown* (1987) 479 U.S. 538, 541.) In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. ([*Ibid*].) Finally, we determine whether the instruction, so understood, states the applicable law correctly." (*People v. Warren* (1988) 45 Cal.3d 471, 487.) "The test is whether there is a 'reasonable likelihood that the jury . . . understood the charge,' in a manner that violated defendant's rights." (*People v. McPeters* (1992) 2 Cal.4th 1148, 1191, quoting *People v. Benson* (1990) 52 Cal.3d 754, 801; *Boyde v. California* (1990) 494 U.S. 370, 380.)

105

We readily rejected defendant's contention that the trial court's comments during voir dire regarding aggravating circumstances rendered voir dire inadequate to reveal a potential inability or unwillingness to follow CALJIC No. 8.88. (See discussion, pt. II.A.3, *ante*.) CALJIC No. 8.88, which was given before penalty deliberations, provides in relevant part: "An aggravating factor is any fact, condition or event attending the commission of a crime which increases its severity or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself." Here, before the jurors began their penalty deliberations, the court properly instructed that they were required to "accept and follow the law that [the court] state[s] to you and disregard all other instructions given to you in other phases of this trial." In the absence of any showing to the contrary, we presume the jurors followed this instruction. (See *People v. Cain* (1995) 10 Cal.4th 1, 34 [the jury is presumed to follow the trial court's instructions].)

In instructing the jurors on their task of determining penalty, the court never mentioned the terms "premeditation," "deliberation," or "elements of the crime." On the other hand, the arguments guided the jurors on how they should view aggravating circumstances. Defense counsel explained that an aggravating circumstance under section 190.3, factor (a) is not "simply" a fact that establishes defendant's guilt of the capital crimes but instead is "something beyond [the capital offense] that is so horrible." The prosecutor, too, correctly informed the jurors that aggravating circumstances under factor (a) consisted of "all of those other little details that go beyond the fact of killing with malice aforethought, premeditation, deliberation and includes other things as well." He appropriately told them to use only "those aggravating circumstances beyond the element of the offense itself." For example, the prosecutor encouraged the jurors to consider as an aggravating factor the proof of defendant's intent to kill a third victim, based on

106

evidence showing that after he killed Talley and Garcia, he kept his gun at his side and chased Shirail Burton, who was running shoeless in the parking lot. For these reasons, there is no reasonable possibility that the jurors viewed the instructions as allowing them to consider in aggravation the fact that defendant committed premeditated and deliberate murder in aggravation. Therefore, we reject defendant's claim that the court was obligated to apprise jurors of the elements of the capital charges.

### 7. *Constitutional Challenges to California's Death Penalty Law*

Defendant argues that California's death penalty law and related instructions are unconstitutional on various grounds that we have previously rejected. He offers no persuasive reason to reconsider our prior decisions. Therefore, we continue to hold as follows:

"As we recently observed in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 208, ' "[W]e reiterate that the death penalty statutes adequately narrow the class of murderers eligible for the death penalty, are not impermissibly vague or overbroad, and do not result in an 'arbitrary and capricious' or 'wanton and freakish' penalty determination. [We] also have held that the statutes do not require that the prosecution carry the burden of proof or persuasion at the penalty phase, that the jury make written findings or reach unanimous decisions regarding aggravating factors, or that the jury find beyond a reasonable doubt that (1) the aggravating factors have been proved [(except for other crimes)], (2) the aggravating factors outweigh the mitigating factors, or (3) death is the appropriate sentence." ' " (*People v. Bivert* (2011) 52 Cal.4th 96, 123-124.) Recent high court decisions do not affect these conclusions. (*Id*. at p. 124.)

" 'The absence of procedural safeguards utilized by other states in the operation of their death penalty laws does not render California's law

107

unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments." (*People v. McKinnon* (2011) 52 Cal.4th 610, 697.) " ' "There is no need to instruct the jury at the penalty phase (1) regarding a burden of proof, except as to section 190.3, factors (b) and (c), or the absence of a burden of proof, (2) regarding the meaning of the term 'mitigation,' (3) that mitigating factors can be considered only in mitigation, (4) that if the mitigating evidence outweighs the aggravating evidence, the jury must impose a sentence of life without the possibility of parole, or (5) that the jury is not required to impose the death penalty even if it finds the aggravating evidence outweighs the mitigating evidence. The trial court need not omit from the instructions any mitigating factors that appear not to apply to the defendant's case." [Citation.] [¶] "There is no requirement that the trial court or this court engage in intercase proportionality review when examining a death verdict. A sentence of death that comports with state and federal statutory and constitutional law does not violate international law or norms . . . ." ' [Citation.]" (*People v. Bivert, supra*, 52 Cal.4th at p. 124.)

"The terms 'extreme' and 'substantial' as used in section 190.3 have commonsense meanings that the jury may be expected to use in applying the instructions. [Citation.] 'The use of the word 'extreme' in section 190.3, factor (d) ('extreme mental or emotional disturbance') does not preclude consideration of mitigating evidence in violation of the Constitution.' " (*People v. Tafoya, supra*, 42 Cal.4th at p. 197.)

"The availability of certain procedural protections in noncapital sentencing—such as a burden of proof, written findings, jury unanimity and disparate sentence review—when those same protections are unavailable in capital sentencing, does not signify that California's death penalty statute violates Fourteenth Amendment equal protection principles. [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 510.)

Finally, the asserted flaws in our death penalty statute, whether considered individually or together, do not render it unconstitutional.  (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 45.)

### 8.  *Cumulative Error*

Defendant contends that the cumulative effect of the guilt and penalty phase errors require reversal of his conviction and death sentence even if none of the errors individually compels reversal.  We find no cumulative prejudice.

## III.  DISPOSITION

We affirm the judgment.

CHIN, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Pearson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S058157
**Date Filed:** March 21, 2013

_____

**Court:** Superior
**County:** Contra Costa
**Judge:** Richard S. Flier

_____

**Counsel:**

Jeanne Keevan-Lynch, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler and Ronald S. Matthias, Assistant Attorneys General, Alice B. Lustre, Glenn R. Pruden and Gregg E. Zywicke, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeanne Keevan-Lynch
P.O. Box 2433
Mendocino, CA 95460
(707) 895-2090

Gregg E. Zywicke
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 703-5961